# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JANCO FS 2, LLC AND JANCO FS 3, LLC, | ) ) ) | C.A. No. N23C-03-005 MAA CCLD |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ISS FACILITY SERVICES, INC.; ISS C&S BUILDING MAINTENANCE CORPORATION; ISS TMC SERVICES, INC.; and ISS FACILITY SERVICES CALIFORNIA, INC, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) ) | |
| ISS FACILITY SERVICES, INC.; ISS C&S BUILDING MAINTENANCE CORPORATION; ISS TMC SERVICES, INC.; and ISS FACILITY SERVICES CALIFORNIA, INC., | ) ) ) ) ) ) | C.A. No. N23C-07-036-MAA CCLD Transferred from: C.A. No. 2022-1197-SG |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| JANCO FS 2, LLC; and JANCO FS 3, LLC | ) ) ) | |
| Defendants. | ) ) ) | |

Submitted: May 23, 2024
Decided: August 30, 2024

*ISS's Motion for Partial Summary Judgment:*
**GRANTED in part, DENIED in part.**

*JanCo's Motion for Summary Judgment:*
**GRANTED in part, DENIED in part.**

1

# MEMORANDUM OPINION

Catherine G. Dearlove, Esquire, and Nicholas F. Mastria, Esquire of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, and Jason J. Carter, Esquire (Argued), and Megan Cambre, Esquire (Argued), of BONDURANT MIXSON & ELMORE, LLP, Atlanta, Georgia, *Attorneys for JanCo FS 2, LLC and JanCo FS 3, LLC*.

David J. Teklits, Esquire, Rachel R. Tunney, Esquire, and Louis F. Masi, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, and Mark T. Oakes, Esquire (Argued), and Ryan E. Meltzer, Esquire, of NORTON ROSE FULBRIGHT US, LLP, Austin, Texas, *Attorneys for Defendants ISS Facility Services, Inc., ISS C&S Building Maintenance Corporation, ISS TMC Services, Inc., and ISS Facility Services California, Inc*.

**Adams, J.**

Two entities entered into an asset purchase agreement wherein the buyers purchased a cleaning division from the sellers. That agreement included several covenants, including a covenant not to compete or solicit, and employment agreements pertaining to certain key employees. The agreement also required the sellers to assist the transition by obtaining consents from key accounts, reassigning the service contracts to the buyers. The entities agreed if the consents for the key accounts were obtained within a certain time period, the sellers would be entitled to additional amounts, corresponding to each consent obtained. Obtaining the consents for some accounts took longer than anticipated. The parties subsequently amended the agreement, extending certain timelines and reinforcing the parties' obligations to obtain the consents. The parties also agreed to offset certain costs based on a net working capital calculation the parties would complete after closing the transaction.

The parties ran into several disputes along the way, implicating many of their contractual obligations. Both sides now seek damages for the other side's alleged breach of the agreements. This memorandum opinion addresses the parties' motions for partial summary judgment. For the reasons that follow, both motions are GRANTED, in part, and DENIED, in part.

# I. RELEVANT FACTS[1]

## A. The Parties and Other Relevant Persons[2]

JanCo FS 2, LLC and JanCo FS 3, LLC (collectively "JanCo") both use the trade name "Velociti Services" and are Delaware limited liability companies.[3] JanCo is owned by the Argenbright Group of companies ("Argenbright"), which have been operating since 1978 and provide workforce solutions in human-capital intensive industries.[4]

ISS Facility Services, Inc. is a Delaware corporation[5] whose parent company is ISS A/S, a company headquartered in Denmark.[6] ISS C&S Building Maintenance Corporation is a Florida corporation, and a wholly-owned subsidiary of ISS A/S.[7]

---

[1] The Court notes the consequence of both sides filing motions is that facts repeat in briefing, and several exhibits are duplicates. When the Court cites one parties' brief or exhibits instead of the other's, the Court intends to imply no preference or priority to any party. The Court merely provides a citation to the record for the fact; other citations may provide the same information, but the Court will not cite every part of the record where the information can be found.

JanCo submitted several exhibits on May 23, 2024—the day of oral argument—that were not included in any of the briefs. D.I. 182. The Court will not consider the belatedly produced documents for these motions because ISS was not given adequate time to respond for summary judgment purposes. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[2] This case arises from two cases filed in separate courts, with each side serving as the plaintiffs in one case and defendants in the other. For the sake of clarity the Court will avoid the use of "Plaintiffs" and "Defendants" and instead refer to the parties by name.

[3] JanCo Am. Compl. ¶¶ 1–2. For clarity, where possible, the Court will refer to these parties collectively as JanCo, rather than as "Velociti," "Purchasers," or "Buyers" as they are often referred to in briefing. The Court will also treat JanCo as singular despite noting that "JanCo" represents multiple entities.

[4] JanCo Am. Compl. ¶ 11.

[5] *Id.* ¶ 3.

[6] *Id.*

[7] *Id.* ¶ 4.

ISS TMC Services, Inc. is a New Jersey corporation and a wholly-owned subsidiary of ISS A/S.[8]   ISS Facility Services California is a Delaware corporation and a wholly-owned subsidiary of ISS A/S[9] (all entities are collectively "ISS").[10]

ISS provides workplace and facility management services in over 40 countries and has approximately 400,000 employees.[11]   Among ISS's services, ISS provides commercial cleaning and janitorial services throughout North America.[12]   ISS also offers security, food, technical, and workplace management services.[13]   ISS's Project Bremner (the "Cleaning Division") was a "leading provider of commercial cleaning, hygiene, and janitorial services" with a "[n]ationwide platform capable of servicing national accounts while providing local-market-service quality."[14]   The division had approximately 600 customers.[15]

Jason Pitcock ("Pitcock") is the former Vice President of the Cleaning Division for ISS.[16]   Pitcock was offered "up to 12 months basic salary at 2021 annual salary rate, under certain conditions described in [the] signed retention agreement"

---

[8] *Id.* ¶ 5.
[9] *Id.* ¶ 6.
[10] The Court notes that the parties also refer to ISS as "Sellers."   The Court will refer to these entities only as "ISS" and refer to ISS in the singular.
[11] JanCo Am. Compl. ¶ 9.
[12] *Id.* ¶ 10.
[13] ISS Am. Compl. ¶ 10.
[14] Sandy Xu Aff. in Supp. of Opp'n Br. to ISS's Mot. for Part. Summ. J. [hereinafter "Xu Aff."] Ex. 109, at ISS_000022451.
[15] *Id.*
[16] *Id.* Ex. 138, at 6.

relating to the sale of the Cleaning Division.[17] On July 1, 2022, Pitcock joined JanCo as Vice President of Operations.[18] On October 11, 2022, JanCo terminated Pitcock.[19] On December 1, 2022, Pitcock returned to ISS to handle the IKEA account in ISS's Integrated Facilities Services Business Line.[20]

Susan Jorgensen ("Jorgensen") is ISS's CEO of the Americas region, former CEO of the North American region, and former CFO of the Americas region.[21] Jorgensen interviewed and hired Pitcock back at ISS.[22]

Rene Bartlett ("Bartlett") was the Regional Operations Manager for the ISS Cleaning Division.[23] Bartlett was offered "3 months basic salary at 2021 annual salary rate" as a bonus for the successful sale of the Cleaning Division.[24] On July 1, 2022, Bartlett began at JanCo as Regional Manager for the Southeast Region.[25] Bartlett resigned from JanCo on December 22, 2022.[26] Bartlett then returned to ISS on May 15, 2023 and currently works on the IKEA account.[27]

---

[17] *Id.* at 12.
[18] JanCo Am. Compl. ¶ 138.
[19] *Id.* ¶ 139.
[20] *Id.*; ISS Answer to Am. Compl. ¶ 139; Rachel R. Tunney Aff. in Supp. of Opening Br. in Supp. of ISS Parties' Mot. for Part. Summ. J. [hereinafter "Tunney Aff."] Ex. 102, at 245:20–21; 247:21–22.
[21] Xu Aff. Ex. 138, at 6.
[22] Tunney Aff. Ex. 103, at 97:9–17.
[23] Xu Aff. Ex. 138, at 8.
[24] *Id.* at 12.
[25] Tunney Aff. Ex. 106, at 25:1–6.
[26] JanCo Am. Compl. ¶¶ 187–88; Tunney Aff. Ex. 106, at 25:1–14.
[27] Tunney Aff. Ex. 103, at 173:19–175:13; Xu Aff. Ex. 139, at 25:22–23.

David Rivas ("Rivas") originally worked for ISS before working for JanCo.[28] Rivas resigned from JanCo on October 25, 2022, with a last day of November 11, 2022.[29] Rivas currently works as a facility manager for the Mars account in ISS's IFS business line.[30]

## B.    The Contracts

### 1.    *The APA*

In 2020, ISS began preparing to sell the Cleaning Division[31] and retained Harris Williams LLC ("Harris Williams") as the financial advisor for the sale.[32] Harris Williams solicited JanCo on behalf of ISS to purchase the Cleaning Division in late 2020.[33] In January 2021, Harris Williams provided JanCo with financial and non-financial information about the Cleaning Division.[34] JanCo submitted a bid to ISS for $80 million "based on an estimated annual EBITDA of $13 million[.]"[35] JanCo and ISS (the "parties") signed a letter of intent on May 27, 2021.[36]

---

[28] *See* JanCo Opp'n Br. to ISS's Mot. for Part. Summ. J. [hereinafter "JanCo Opp'n"] 27; Reply in Supp. of ISS Parties' Mot. for Part. Summ. J. [hereinafter "ISS Reply"] 21.

[29] JanCo Am. Compl. ¶ 191; Xu Aff. Ex. 161.

[30] ISS Answer ¶ 192.

[31] JanCo Pls.' Opening Br. in Supp. of Mot. for Part. Summ. J. [hereinafter "JanCo Br."] 1 (citing JanCo Am. Compl. ¶ 13; ISS Am. Compl ¶ 18; Nicholas F. Mastria Aff. in Supp. of Pls.' Opening Br. in Supp. of their Mot. for Summ. J. [hereinafter "Mastria Aff."] Ex. A, at ISS_000023107).

[32] Tunney Aff. Ex. 1, § 4.4.

[33] JanCo Br. 1–2 (citing JanCo Am. Compl ¶ 15; ISS Am. Compl. ¶ 1).

[34] *See generally* Mastria Aff. Ex. C.

[35] JanCo Am. Compl. ¶ 18.

[36] *Id.* The Court did not observe the letter of intent in the exhibits provided but notes that ISS admitted a letter of intent was signed on that date. ISS Answer ¶ 18.

7

On September 20, 2021, the parties entered into the Asset Purchase Agreement (the "APA").[37] On the same day, the parties also executed a Transition Services Agreement;[38] an Employee Lease Agreement;[39] and an Escrow Agreement.[40] The transaction closed on November 30, 2021 (the "Closing").[41]

The APA allowed for amendments and waivers with certain conditions as depicted in Section 9.13:

> No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by [JanCo] and [ISS]. No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.[42]

### 2. The Escrow Agreement

The parties entered into an Escrow Agreement with an Escrow Agent on November 30, 2021.[43] The Escrow Agreement disclaimed any duties of the Escrow Agent under the APA.[44] The "Escrow Period" referred to "the period commencing

---

[37] Tunney Aff. Ex. 1 [hereinafter "the APA"].
[38] JanCo Am. Compl. Ex. D.
[39] *Id.* Exs. E1, E2.
[40] Tunney Aff. Ex. 108.
[41] APA § 6.1(d); JanCo Am. Compl. ¶ 58.
[42] APA § 9.13.
[43] *See generally* Tunney Aff. Ex. 108 [hereinafter "Escrow Agreement"].
[44] The Escrow Agreement § 10(a) stated, in part, the "Escrow Agent has no liability under and no duty to inquire as to the provisions of any document other than this Agreement, including without

8

on the date hereof and ending at the close of Escrow Agent's Business Day on the first anniversary of the date of this Agreement, unless earlier terminated pursuant to this Agreement."[45] The Escrow Agent was required to "disburse Escrow Funds at any time and from time to time, upon receipt of, and in accordance with, a Joint Written Direction . . . ."[46] When the Escrow Period expired, "Escrow Agent shall distribute to [JanCo] pursuant to the funds transfer instruction set forth in this Section 4(b), as promptly as practicable, any remaining Escrow Funds not subject to a Claim Notice as provided in Section 6."[47]

> The Escrow Agreement contained a dispute resolution procedure requiring:
>
> (a) [ISS] shall give written notice of such claim (a "Claim Notice") to Escrow Agent and [JanCo] prior to the expiration of the Escrow Period. Such Claim Notice must include a description of the Unobtained Required Consent (including a copy of the written consent) and the amount to be disbursed with respect to such Unobtained Required Consent, as such amount is set forth in Schedule 2.2(f) of the Purchase Agreement.
>
> (b) Escrow Agent shall pay a Disbursement Claim to [ISS] from the Escrow Funds only pursuant to (i) [JanCo's] written direction, (ii) a Joint Written Direction or (iii) a Final Order.[48]

---

limitation any other agreement between any or all of the parties hereto or any other persons even though reference thereto may be made herein and whether or not a copy of such document has been provided to Escrow Agent."

[45] Escrow Agreement § 1.

[46] *Id.* § 4(a).

[47] *Id.* § 4(b) (emphasis in original).

[48] *Id.* § 6.

### 3. The Amendment to the APA

The parties agreed to an Amendment of the APA (the "Amendment") on November 30, 2021.[49] The Amendment added to the purchase price the cost of equipment ISS purchased—JanCo obtained the equipment as part of the APA.[50] The purchase price amount thus increased $1,435,387.00 plus any associated taxes.[51] The Amendment also extended the deadline to obtain certain required consents.[52]

## C. The Consents

### 1. The Contractual Provisions Dealing with Consents

Section 1.1(a) of the APA listed "Target Accounts" under "Purchase and Sale of Purchased Assets."[53] Target Accounts referred to

> All of [ISS's] right, title and interest in and to all of the customer relationships and accounts listed on attached Schedule 1.1(a), and the right and obligation of [ISS] to provide premium cleaning and janitorial services to such accounts and receive payment therefor, whether or not evidenced by a written contract[.][54]

Schedule 1.1(a) included 258 accounts.[55] APA Section 2.2(f) required ISS to "deliver, or cause to be delivered" to JanCo "[s]ubject to Section 6.1(d) below, consents to assignment of Assumed Contracts from those customers listed on

---

[49] Tunney Aff. Ex. 5 (the "Amendment").
[50] Amendment § 3.
[51] *Id.*
[52] *See id.* §§ 6, 8.
[53] APA, Art. 1.
[54] *Id.* § 1.1(a) (emphasis in original).
[55] *Id.* sched. 1.1(a).

Schedule 2.2(f) (collectively 'the Required Consents')[.]"[56]  Schedule 2.2(f) listed 20 accounts, ten of which listed a "Potential Adjustment."[57]  The APA defined "Excluded Assets" as "all other assets of [ISS]" "except for the Purchased Assets as specifically described" in Section 1.1.[58]  Section 2.8 noted that

> If any Purchased Assets are not assignable or transferrable to [JanCo] without the consent of any Governmental Authority or third party, and such consent has not been obtained prior to the Closing and the Closing occurs, this Agreement and the Bill of Sale shall not constitute an assignment or transfer thereof unless and until such consent is obtained and until such time shall constitute Excluded Assets.  In such case, [ISS] shall use their best efforts to obtain such consent as soon as possible after the Closing; provided, however, that [JanCo] shall cooperate, at no expense to [JanCo], with [ISS] in that endeavor.[59]

Section 6.1(d) detailed that

> [ISS] shall have obtained and delivered to [JanCo] all of the Required Consents; *provided, that*, if on or before October 31, 2021 [ISS has] not obtained all of the Required Consents, then (i) the End Date shall automatically be extended to November 30, 2021, and (ii) [ISS] shall use their good faith best efforts to obtain the remaining Required Consents prior to November 30, 2021; *provided, further, that*, if on or before November 30, 2021 [ISS has] not obtained and delivered all of the Required Consents to [JanCo], as long as [ISS has] obtained consents to assignment or novation from the Top 10 Customers by November 30, 2021, then, (x) subject to the other closing conditions set forth in Section 6.1 and Section 6.2 being satisfied or waived, the Parties will consummate the Closing and (y) at Closing, with respect to the Required Consents that have not been obtained by [ISS] (collectively, the "Unobtained Required Consents"), [JanCo] will deposit into an escrow account with an escrow agent mutually agreed upon by the Parties (the "Escrow Agent"), an amount equal to the sum

---

[56] *Id.* § 2.2(f) (emphasis in original).
[57] *Id.* sched. 2.2(f).
[58] *Id.* § 1.2.
[59] *Id.* § 2.8.

11

of the purchase price adjustment amounts set forth opposite the name of each Target Account relating to the Unobtained Required Consents on Schedule 2.2(f), *provided, further, that*, [ISS] will then have one hundred twenty (120) days immediately following the Closing Date to obtain the Unobtained Required Consents, and for each Unobtained Required Consent obtained and delivered by [ISS] to [JanCo] during the 120-day period immediately following the Closing Date, [JanCo] shall authorize and instruct, jointly with [ISS], the Escrow Agent to release and pay to [ISS] out of the escrow account an amount equal to the purchase price adjustment amount set forth opposite the name of each Target Account on Schedule 2.2(f) for which an Unobtained Required Consent is obtained and delivered during the 120-day period immediately following the Closing Date; *provided, further, that,* if any of the Unobtained Required Consents are not ultimately obtained and delivered by [ISS] within the 120-day period following the Closing Date, then the Escrow Agent, without further instruction from [ISS] or [JanCo], shall release and pay to [JanCo] any amounts remaining in the escrow account relating to the Unobtained Required Consents upon the expiration of the 120-day period[.][60]

The APA also set that "[t]he Purchased Assets will collectively constitute, as of the Closing, all of the assets, tangible and intangible, necessary to service the Target Accounts in substantially the same manner in which the Target Accounts are currently being serviced by [ISS]."[61] The APA detailed

Since December 31, 2020, no Target Account that is party to a Material Contract has terminated such Material Contract or has threatened to do so and no Seller is involved in any claim, dispute or controversy with any customer or any of its other customers related to the Target Accounts that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Schedule 4.22 sets forth the ten (10) largest customers (each determined by gross revenue received) within the Target Accounts (the "Top 10 Customers").[62]

---

[60] *Id.* § 6.1(d) (emphasis in original).
[61] *Id.* § 4.16.
[62] *Id.* § 4.22 (emphasis in original).

12

The parties agreed

> No representation or warranty made by [ISS] in this <u>Article 4</u>, nor any schedule attached hereto contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained therein not misleading.[63]

As a further requirement on the parties, the APA listed

> Except for the representations and warranties contained in this <u>Article 4</u>, neither [ISS] nor [JanCo] nor any other Person makes any express or implied representation or warranty with respect to [ISS] or any of their Affiliates, the probable success or profitability of the Target Accounts, this Agreement or the other Transaction Documents or the Transactions contemplated hereby or thereby, and [ISS] expressly disclaim[s] any other representations, warranties, forecasts, projections, statements or information, whether made or furnished by [ISS] or any of their Affiliates or any of their respective representatives or any other Person.[64]

The Amendment updated the consent requirements when some consents were not obtained by the original deadline, noting that

> The Parties acknowledge that pursuant to Section 6.1(d) of the Purchase Agreement, [ISS] obtained consents to assignment or novation from the Top 10 Customers prior to November 30, 2021, except for the Federal Aviation Administration ("<u>FAA</u>"), which has not consented to the novation to [JanCo] of the FAA's contract with [ISS] (the "<u>FAA Contract</u>"). [JanCo] agree[s] to waive the closing condition that the FAA consent to the novation of the FAA Contract to [JanCo], and the Parties agree to continue to use their best efforts following Closing to obtain the FAA's consent to novation of the FAA Contract. The Parties further agree that the unobtained FAA consent shall be treated as an "Unobtained Required Consent" in accordance with Section 6.1(d) of the Purchase Agreement, including depositing into escrow the

---

[63] *Id.* § 4.25 (emphasis in original).
[64] *Id.* § 4.26 (emphasis in original).

"Potential Adjustment" amount set forth opposite the FAA's name on Schedule 2.2(f) of the Updated Schedules.[65]

As to unobtained consents, the Amendment noted

> The Parties acknowledge and agree that as of the Closing [ISS has] not obtained consents to assignment of the Target Accounts set forth on Exhibit D attached hereto. The Parties agree to continue to use their best efforts following Closing to obtain such consents, and such unobtained consents shall be treated as "Unobtained Required Consents" in accordance with Section 6.1(d) of the Purchase Agreement, including depositing into escrow the "Potential Adjustment" amount set forth opposite each Target Account's name on Exhibit D (without duplication with respect to the FAA as contemplated in Section 6 above).[66]

The APA also included certain disclosure requirements on the parties as set forth

> After the Closing Date, if any items of payment, correspondence or other materials pertaining to the Target Accounts are received from a third party by [ISS], [ISS] shall promptly forward such payment, correspondence or other materials to [JanCo].[67]

Similarly,

> (a) The Parties agree to work cooperatively and in good faith to obtain the Required Consents and to obtain the necessary consents to the assignment and novation of the contracts of the Target Accounts in addition to the Required Consents both before and after the Closing Date. [ISS] agree[s] to undertake commercially reasonable efforts to include [JanCo] in discussions with the Target Accounts related to obtaining the foregoing consents, and after the Closing Date, [JanCo] agree[s] to cause or allow members of the management team managing the Target Accounts prior to the Closing Date and who are expected to become employees of [JanCo] upon termination of the Employee Lease

---

[65] Amendment § 6 (emphasis in original).
[66] *Id.* § 8 (emphasis in original).
[67] APA § 5.17(b).

Agreements to provide commercially reasonable assistance in obtaining the Required Consents.

(b) The Parties acknowledge and agree that in connection with the assignment or novation of the contracts of certain Target Accounts, including [ISS]'s contract with the Federal Aviation Administration, the Target Account may require [ISS] to guarantee [JanCo's] performance under the relevant contract after the assignment or novation, including future changes in scope of service to which [ISS] will not have notice or information. If any such guarantee by [ISS] is required, then in connection with the relevant assignment or novation, [JanCo] will provide a performance bond, in favor of [ISS] that indemnifies [ISS] against any Losses incurred by [ISS] related to any guarantee of performance of an assigned Target Account contract as described above.[68]

The Potential Adjustments provided for in APA Section 6.1(d) "reflected the contribution of each contract to the enterprise value of the business sold to [JanCo], calculated by multiplying the annualized 2Q21 revenues from each contract by 0.47 (a multiple representing the ratio between the $80 million purchase price and the $170.2 million in annualized revenues from the business)."[69] The Potential Adjustments for the consents from the entities relevant to the summary judgment motions included $1.5 million for Ingram Micro, $5.6 million for the FAA, and $1.3 million for Pima County.[70] These consents have been obtained—Ingram Micro before the deadline, and the FAA and Pima County after the deadline—but JanCo has not provided ISS with these amounts. A JanCo executive testified that these

---

[68] *Id.* § 5.19.
[69] ISS Opening Br. in Supp. of ISS Parties' Mot. for Part. Summ. J. [hereinafter "ISS Br."] 7–8 (citing Tunney Aff. Exs. 2, 3, 4).
[70] *Id.* 11 (citing APA, Ex. D).

three escrow amounts were withheld from ISS, despite ISS obtaining the consents, because of "unethical business practices" including that ISS was "not telling the truth about how many employees [JanCo was] going to get so that [ISS] could falsify the EBITDA and overcharge [JanCo] for the business."[71]

No extension arrangement for the consents was ever signed by both ISS and JanCo.[72] The contemplated, unsigned extension only lasted 60-days.[73] Capital Tower, another Required Consent, was received on April 24, 2022, and JanCo prepared the escrow release letter on July 29.[74] On August 4, the parties submitted a Joint Written Direction to the Escrow Agent for the Capital Tower consent and the Escrow Agent disbursed the funds on August 10, 2022.[75]

### 2. The Ingram Micro Consent

Three ISS accounts regarding the consents are at issue in this litigation. The first is Ingram Micro, a top-ten ISS customer. After ISS obtained this consent, JanCo would be entitled to an adjustment amount of $1.49 million.[76] During the time ISS was attempting to obtain Ingram Micro's consent, Ingram Micro was going through structural changes wherein Ingram Micro was selling part of its logistics operation

---

[71] Tunney Aff. Ex. 99, at 58:13–25.

[72] *See, e.g.*, JanCo Br. 6 (citing Mastria Aff. Ex. G, at ISS_000372588).

[73] JanCo Reply Br. in Supp. of JanCo's Mot. for Part. Summ. J. [hereinafter "JanCo Reply"] 8 (citing Mastria Aff. Ex. H, § 1(d); Ex. I, at ISS_000104625; Ex. J, at ISS_000105820).

[74] ISS Opp'n 18–19 (citing Tunney Aff. Ex. 114, at ISS_000122155; Ex. 115, at ISS_000122314; Ex. 116, at ISS_000122344; Ex. 117, at JANCO-00198855).

[75] Tunney Aff. Ex. 118, at JANCO-00198975; Ex. 119, at ISS_000153352.

[76] Amendment, sched. 2.2(f).

to non-party CEVA Logistics ("CEVA").[77] On January 14, 2022, Pitcock forwarded a spreadsheet to multiple JanCo and Argenbright employees tracking changes to the consents which indicated an awareness of the changes happening at Ingram Micro.[78] In response to a question by JanCo, asking about "risks" with Ingram Micro, Pitcock noted that Ingram had "undergone change in their organizational structures" but that there were "[n]o operational issues that are known[.]"[79]

ISS obtained the Ingram Micro written consent for JanCo on January 30, 2022.[80] On January 31, ISS learned from Ingram Micro that Ingram Micro was in the process of selling part of its operations to CEVA.[81] As a result, Ingram Micro requested ISS to execute a "Partial Assignment of the Agreement" between ISS and Ingram Micro to CEVA as part of Ingram Micro's partial divestment (the "Novation Agreement")—essentially the same process ISS was undergoing on behalf of JanCo, Ingram Micro was doing on behalf of CEVA.[82] The ISS employees involved in this

---

[77] *See, e.g.*, Tunney Aff. Ex. 15, at JANCO-00019781.
[78] *Id.* Ex. 20, at JANCO-00125259, F-14 (stating "Meeting complete and initial positive feedback received. Consent is being forward to senior procurement representative for final signature. Returned AH redline for client review on 11/18/21. Follow-up on 01/12/2022 advised that procurement is still working to obtain document from legal (due to their own acquisitional activities there has been a delay). Ops touch base scheduled for 01/18/22 for additional update.").
[79] *Id.* Ex. 21, at JANCO-00197100.
[80] *Id.* Ex. 6.
[81] *See generally id.* Ex. 15.
[82] *See generally id.* Ex. 16.

correspondence included Pitcock, who was on lease to JanCo pursuant to the Employee Lease Agreements.[83]

JanCo received notice of the signed consent from Ingram Micro regarding consent for ISS's accounts to shift to JanCo on February 1, 2022.[84] Also on February 1, Pitcock signed the Novation Agreement for Ingram Micro to divest its contracts to CEVA.[85] JanCo notes that Pitcock signed the Novation Agreement as an executive of ISS, not on behalf of JanCo.[86] ISS, however, reinforces that Pitcock spoke to JanCo's CFO, Mr. Maynord, before signing the Ingram Micro Novation Agreement.[87] On February 7, Ingram Micro sent an updated Novation Agreement which was forwarded on the same day to Pitcock.[88] On February 16, Pitcock forward the email chain and attachments to JanCo's integration consultant, Brian Hage, who then forward the chain and attachment to JanCo's counsel and executives.[89]

On March 9, JanCo prepared a notice to the Escrow Agent directing the release of the $1.5 million adjustment.[90] On March 11, ISS responded stating that

---

[83] ISS Br. 13 (citing Tunney Aff. Ex. 1 §§ 4.20, 5.10, sched. 4.20(a); Ex. 17, at JANCO-00055882).
[84] Tunney Aff. Ex. 7.
[85] *See generally id.* Ex. 16.
[86] *See id.* at ISS_000223636 (signing as "Vice President" under the signature entitled "ISS Facilities Services, Inc.").
[87] ISS Reply 9–10 (citing Louis F. Masi in Supp. of ISS Reply [hereinafter "Masi Aff."] Ex. A, at 438:15–439:24).
[88] Tunney Aff. Ex. 18.
[89] *Id.* Ex. 19. The Court notes that the Brian Hage's email to JanCo's counsel and executives has been redacted, so the Court can only determine that the Novation Agreement was forwarded, not the content of the email in which it was attached. *See also* JanCo Opp'n 17 (noting that February 16, was the first time JanCo was informed of Ingram Micro's divesting to CEVA).
[90] Tunney Aff. Ex. 8.

ISS was "connecting internally" to "discuss this as well as other points from the NWC call."[91] On March 21, ISS forwarded three escrow release letters to ISS's legal counsel, including the escrow release letter "to ISS for consent received for Ingram Micro."[92] On March 29, JanCo followed up with ISS, noting that ISS "is sitting on those" escrow letters.[93] On May 30, ISS responded that "Ingram is correct, and we should execute this version and release the funds[.]"[94]

On April 4, Ingram Micro finalized the divestment of its logistics business to CEVA.[95] On April 29, a customer survey indicated dissatisfaction with ISS via Ingram Micro.[96] On April 30, JanCo's CFO, John Maynord, emailed to ask about the status of Ingram Micro and was told that Ingram Micro had "split in to two entities."[97] On June 7, ISS emailed JanCo to indicate that the Ingram Micro "release letter is correct and contains the proper escrow amount to be released to ISS."[98] On June 17, CEVA notified ISS that it was not continuing a contractual relationship

---

[91] Xu Aff. Ex. 156, at ISS_000101320–21.
[92] *Id.* Ex. 157, at ISS_000364646. The email itself is redacted as "privileged" so the Court relies on the representation that these letters were included as an attachment based on the prior email in the chain on March 9, 2022 listing that the three letters were attached. *Id.* at ISS_000364647. The other two escrow release letters were for "[r]elease of escrow [JanCo] for lost client – Texas Tower" and "[r]elease of escrow to [JanCo] for lost business with Smith & Nephew." *Id.*
[93] *Id.* Ex. 158, at JANCO-00139526.
[94] *Id.* Ex. 159, at ISS_000144310.
[95] *See* Tunney Aff. Ex. 22, at JANCO-00066236.
[96] Xu Aff. Ex. 132, at JANCO-00000731 ("Primary Client Concern: Getting rid of ISS."). JanCo relies on this survey as evidence of ISS's "mismanag[ement of] Ingram Micro's remaining business" making it harder for JanCo to retain CEVA as a client after the transfer. JanCo Opp'n 17–18.
[97] Tunney Aff. Ex. 23.
[98] Xu Aff. Ex. 160, at ISS_000147321.

with JanCo.[99] The remainder of the Ingram Micro contracts with JanCo would continue despite CEVA's departure.[100] That same day, ISS forwarded the email to JanCo.[101]

JanCo did not release the adjustment amount, instead indicating on July 1 that "[t]here are a couple of issues" to discuss.[102] ISS understood the delay to be as a result of JanCo's impression that "consent to the assignment of the entire contract ha[d] not been obtained" and sought additional documentation on July 11, from JanCo.[103] ISS again asked for information about the Ingram Micro escrow delay on August 1.[104]

On September 7, JanCo indicated that it had "lost $1.62MM out of the $3.18MM of revenue" from Ingram Micro "due to lost business based on the assignment" of Ingram Micro's business to CEVA.[105] Consequently, JanCo asserted that ISS should only receive $734,000.00 of the related escrow amount.[106]

The contract between Ingram Micro and ISS allowed either party to terminate the contract "for convenience" with at least thirty (30) days' written notice.[107] ISS

---

[99] *See generally id.* Ex. 133; Tunney Aff. Ex. 26, at JANCO-00076755–56.
[100] Xu Aff. Ex. 134, at 75:9–13; Ex. 135, at JANCO-00078093.
[101] Tunney Aff. Ex. 26, at JANCO-00076755.
[102] *Id.* Ex. 9.
[103] *Id.* Ex. 10.
[104] *Id.* Ex. 11, at JANCO-00198932.
[105] *Id.* Ex. 12, at JANCO-00156575.
[106] *Id.*
[107] *Id.* Ex. 13, at ISS_000226041.

asserts that it "promptly advised [JanCo] of Ingram Micro's divestment" to CEVA.[108]

At ISS's Pitcock deposition, Pitcock noted that Ingram Micro sold a portion of its business before the Ingram Micro consent transaction.[109] Pitcock, however, clarified that he learned of the Ingram Micro divestiture "somewhere in [the] area" of January 31, 2022.[110] Pitcock detailed his involvement with Ingram Micro noting that "subsequent" to the consent, ISS discussed with CEVA the divestment and ISS's contracts.[111] Pitcock noted that Ingram Micro told ISS they had to "get a contract for CEVA on [the consents] because [Ingram Micro] divested it."[112] Despite attempting to obtain a consent contract with CEVA, CEVA declined because "[t]hey had a different provider."[113] From this time period, through to the end of 2022, JanCo was "reliant on ISS on all the information that [JanCo] had to run the business[.]"[114]

On October 25, 2022, ISS told JanCo "we are willing to discuss a compromise on Ingram Micro."[115] On November 2, ISS further stated, "we are willing to accept a partial release of Ingram Micro escrow amount to [JanCo] . . . [the] Amount

---

[108] ISS Br. 12.
[109] Xu Aff. Ex. 126, at 312:18–24.
[110] Masi Aff. Ex. A, at 436:20–438:10.
[111] *See* Xu Aff. Ex. 126, at 313:1–314:6.
[112] *Id.* at 313:19–25.
[113] *Id.* at 316:2–7.
[114] *Id.* Ex. 118, at 146:1–15.
[115] Tunney Aff. Ex. 97, at JANCO-00118849.

[JanCo] will receive is USD 747k, equivalent to half of the Ingram Micro escrow amount."[116]

### 3.    The FAA Consent

The next consent at issue is the Federal Aviation Association ("FAA") account, JanCo's largest account based on revenue.[117]  Failing to obtain the FAA consent entitled JanCo to the adjustment amount of $5.63 million.[118]  On October 4, 2021, ISS provided JanCo with a draft novation agreement for the FAA contract.[119]  On October 8, JanCo responded to the draft stating that it was "working on this" and will "push to get you the materials early next week."[120]  ISS responded that same day encouraging a response because "the FAA novation is likely one of the longer lead-time items to get to closing[.]"[121]  On October 12, the parties submitted the novation documents to the FAA.[122]

On October 19, the FAA notified JanCo that it need to be registered in SAM.gov, and while Argenbright was registered, it had a pending exclusion that the FAA needed more information on.[123]  That day, ISS contacted JanCo requesting

---

[116] *Id.* Ex. 74, at JANCO-00198573.
[117] *Id.* Ex. 72, at JANCO-00156188; Ex. 73, at 167:8–24.
[118] Amendment, sched. 2.2(f).
[119] Tunney Aff. Ex. 28.
[120] *Id.* Ex. 29, at JANCO-00104536.
[121] *Id.* at JANCO-00104535.
[122] *Id.* Ex. 30.
[123] *Id.* Ex. 31, at ISS_000050112.

JanCo prioritize the FAA because "this [was] a key consent to obtain."[124] On October 27, ISS informed JanCo that they "need[ed] to make progress immediately on the FAA contract novation" and detailed the "most recent list of requests."[125] ISS also noted that obtaining the FAA consent was "going to take a fair amount of time."[126]

On November 3, ISS forwarded JanCo the FAA email regarding Argenbright's exclusion, and requested JanCo respond.[127] On November 5, JanCo stated "[t]he short answer is that . . . there was an issue in the past that we should disclose to the FAA."[128]

On November 10, the FAA informed the parties that "the FAA does not find this novation in the best interest of the Government" citing the registration issues with JanCo and Argenbright.[129] JanCo noted to ISS that "we need to be all over this one," and Argenbright resubmitted the SAM.gov registration.[130] On November 11, ISS informed the FAA that one of the concerns had been corrected and the other "appears to be based upon an administrative error in SAM.gov." and JanCo would provide a detailed letter addressing the issue by November 16.[131] On November 16,

---

[124] *Id.* Ex. 32, at ISS_000196668.
[125] *Id.* Ex. 33, at ISS_000010884.
[126] Mastria Aff. Ex. D, at JANCO-00202631.
[127] Tunney Aff. Ex. 34, at JANCO-00109750.
[128] *Id.* Ex. 35, at ISS_000012849.
[129] *Id.* Ex. 36, at ISS_000014090.
[130] *Id.* Ex. 37, at JANCO-00202648; Ex. 38, at ISS_000014378.
[131] *Id.* Ex. 38, at ISS_000014378.

JanCo addressed the exclusions with the FAA.[132]  On November 22, the FAA responded that it was unable to "determine if it mitigates the risks" and instructed "Argenbright as the parent company of [JanCo]" to be registered in SAM.gov, stating that "[i]f Argenbright can be registered in SAM.gov, the FAA would be satisfied and the novation can move forward."[133]

On December 30, the parties submitted a second novation request to the FAA noting that Argenbright and JanCo had been registered with SAM.gov.[134]  On January 12, 2022, the FAA responded that the novation agreement was being reviewed, but could not provide a timeline for completion.[135]  The FAA then consented to a performance bond on January 28, 2022 through to February 2022.[136]

On March 23, 2022, JanCo emailed ISS to propose an extension on certain client consent deadlines, including the FAA, for sixty days.[137]  ISS agreed, and JanCo said it was "working on" a draft amendment to address the extension.[138]  On the day of the original 120-day period, March 31, 2022, JanCo sent a draft amendment attached stating "[o]ur intent is clear to extend the relevant deadlines" but clarified "we are not yet sure what the ultimate solution will be for billing and

---

[132] *See generally id.* Ex. 39.
[133] *Id.* Ex. 40, at ISS_000055361.
[134] *Id.* Ex. 41, at ISS_000070798.
[135] *Id.* Ex. 42.
[136] ISS Br. 19 (citing Tunney Aff. Exs. 43, 44).
[137] Tunney Aff. Ex. 45, at JANCO-00106741.
[138] *Id.* at JANCO-00106738–40.

collecting from customers that have not provided consents by the end of the TSA period."[139]  On April 1, ISS responded with its revisions to the draft amendment,[140] an updated draft of the FAA novation agreement, and a draft performance guarantee.[141]  On April 5, ISS followed up indicating a "need to get this resolved today and the amendments signed."[142]  On April 8, JanCo represented to ISS that the "APA Amendment is in final form.  The Argenbright team will want to sign this in connection with the TSA Amendment once finalized."[143]  On April 11, ISS emailed again stating "[m]y understanding is that you are signed off on the APA Amendment, but we need your thoughts on the TSA Amendment as soon as possible."[144]  JanCo responded on the same day with "Yes. I will send comments later today, as well as comments on the FAA Guaranty."[145]  On April 12, ISS sent a revised draft of the TSA Agreement; JanCo responded on April 13, "[t]he revised draft works for us."[146]  ISS's Jorgensen testified that the correspondence back and forth about a possible extension "wouldn't be sufficient to change the deadline on the APA."[147]

---

[139] *Id.* Ex. 46, at JANCO-00139422.
[140] *Id.* Ex. 47, at JANCO-00107850.
[141] *Id.* Ex. 51, at JANCO-00107831.
[142] Mastria Aff. Ex. F, at ISS_000108244.
[143] Tunney Aff. Ex. 121, at ISS_000367884.
[144] *Id.* Ex. 48, at ISS_000110065.  ISS challenges JanCo, noting that JanCo never corrected ISS's assertion that JanCo was "signed off on the APA Amendment."  ISS Answering Br. in Opp'n to JanCo's Mot. for Summ. J. [hereinafter "ISS Opp'n"] 15 (citing Tunney Aff. Ex. 122, at ISS_000110659–60).
[145] Tunney Aff. Ex. 49, at ISS_000110097.
[146] *Id.* Ex. 50, at JANCO-00107708.
[147] Xu Aff. Ex. 123, at 225:14–25.

On May 16, the parties agreed to a final guaranty agreement for the FAA novation.[148] On May 16, ISS again asked about extending the deadlines for the consents.[149] On May 18, the parties sent the FAA the revised novation agreement.[150] By request of the FAA, the parties provided a signed copy of the novation agreement to the FAA on June 6.[151] On June 27, the FAA emailed a letter indicating its consent to the novation.[152] JanCo raised concerns that the FAA had not signed the actual agreement the parties signed, instead only providing the letter via email.[153] ISS confirmed the FAA would sign the novation agreement "where consents have been received,"[154] *i.e.*, when ISS sent the final invoices.[155]

On July 1, ISS asked JanCo when the escrow letter would be completed.[156] JanCo responded "There are a couple of issues we need to discuss around FAA (we are actually waiting for their final formal sign off once ISS clears outstanding invoices, but they have given the[ir] conditional consent which is great)[.]"[157] On August 4, the FAA sent a contract modification form[158] and JanCo signed it that

---

[148] Tunney Aff. Ex. 52, at JANCO-00107956.
[149] Mastria Aff. Ex. G, at ISS_000372588 ("It would seem to me given passage of time that the deadline for obtaining the remaining consents should be extended until June 30 (instead of end of May).").
[150] Tunney Aff. Ex. 53, at JANCO-001991185; Ex. 54, at ISS_000137239.
[151] *Id.* Ex. 55, at JANCO-00163124; Ex. 56, at JANCO-00199407; Ex. 123, at JANCO-00056310.
[152] *Id.* Ex. 57, at ISS-000149798–00.
[153] *Id.* Ex. 58, at JANCO-00194514.
[154] *Id.* Ex. 59, at ISS_000150046.
[155] *Id.* Ex. 58, at JANCO-00194513–14.
[156] *Id.* Ex. 60, at JANCO-00109850.
[157] *Id.* Ex. 9, at JANCO-00135432.
[158] *Id.* Ex. 61, at ISS_000376280–87.

day.[159] On August 11, ISS asked JanCo again for the FAA escrow letter.[160] On August 23, after receiving no response, ISS emailed JanCo asking again about the escrow letter.[161] On August 25, ISS requested a call to discuss the escrow releases and "a few additional things."[162]

On September 8, ISS sent a draft escrow letter for the FAA to JanCo for JanCo's signature.[163] ISS sent follow-up emails on September 9 and September 12; JanCo did not respond.[164] In an October 4 email, JanCo referred to the FAA consent, among other things, in a section entitled "[o]ther considerations outside of the NWC settlement[.]"[165]

By November 2022, JanCo had been servicing the FAA and received all revenues associated with the account for approximately one year.[166] The first time that JanCo indicated an issue with the consents was on November 8, 2022.[167] There, JanCo indicated it would "agree to release these amounts to you subject to agreement on all of the other issues resolved to our satisfaction."[168] On November 21, ISS sent

---

[159] *Id.* Ex. 62, at JANCO-00203552.
[160] *Id.* Ex. 11, at JANCO-00198932.
[161] *Id.* Ex. 63, at JANCO-00106607.
[162] *Id.* Ex. 64, at JANCO-00106547.
[163] *Id.* Ex. 65, at JANCO-00108021.
[164] *Id.* Ex. 66, at JANCO-00108013–14.
[165] *Id.* Ex. 67, at JANCO-00156349–50.
[166] *See id.* Ex. 69, at ISS_000061772, Ex. 70, at 148:15–149:20.
[167] *Id.* Ex. 74, at JANCO-00198571 ("As a reminder, the FAA and Pima consents were not received in a timely manner pursuant to the specific terms of the APA (and even the extension we exchanged, but never executed).").
[168] *Id.* Ex. 74, at JANCO-00198571.

claim notices to the Escrow Agent and JanCo for the FAA amount.[169]    On

November 23, JanCo responded to the claim notice asserting that JanCo "do[es] not

consent to payment of any of the Disbursement Claims" including the FAA claim.[170]

On December 5, ISS contacted JanCo asserting that JanCo's "refusal to submit a

joint instruction to the Escrow Agent for the release of the Escrow Funds constitutes

a breach of the Asset Purchase Agreement between [JanCo] and [ISS] (the 'APA'),

as well as the Escrow Agreement."[171]

### 4.    The Pima County Consent

The final consent at issue is Pima County, Arizona.[172]  Pima County was the

fourteenth largest account by revenue, and the adjustment amount was $1.28

million.[173]  On October 8, 2021, ISS sent Pima County a consent form.[174]  On

October 25, ISS accepted Pima County's redlined version of the form.[175]  ISS sent

several follow-up emails to Pima County throughout November requesting

---

[169] *Id.* Ex. 68, at JANCO-00198448–51; Ex. 124, at JANCO-00198456–84.
[170] *Id.* Ex. 71, at JANCO-00202950.  JanCo also noted that "the Holdback Amount due to [ISS] is zero" based on JanCo's "estimate [that] their damages [would] be well in excess of $10,000,000."  JanCo Am. Compl. Ex. V, at 4.
[171] *Id.* Ex. Y, at 1.
[172] Amendment, sched. 2.2(f).
[173] Tunney Aff. Ex. 72, at JANCO-00156188.
[174] *Id.* Ex. 75, at ISS_000197154–58.
[175] *Id.* Ex. 76, at ISS_000010525.

execution of the agreement.[176]  On December 3, ISS informed JanCo that Pima County "promise[s] to have [the] form ready early next week."[177]

On March 16, 2022, JanCo sent the consent form to Pima County via DocuSign.[178]  During the parties' discussions on extending the consent deadlines, the parties discussed Pima County at the end of March, 2022.[179]  On May 19, 2022, ISS noted "[w]e are awaiting confirmation that [Pima County is] live in [JanCo's] setup, which I understand will be just as good as a consent (Scott [Strobridge] confirmed they will treat it like a consent.)"[180]  On May 30, ISS asked JanCo for a status update on Pima County regarding JanCo's receipt of payments and whether this would allow for the parties to agree to an escrow agreement.[181]  On June 13, Pitcock informed ISS that "we are working to finalize the new contract/billing setup with Pima County this week."[182]  On July 19, the Pima County consent was received.[183]  Like with the FAA, JanCo declined to release the escrow funds, noting that the parties had to resolve other issues first.[184]

---

[176] *Id.* Ex. 77, at ISS_000055602–03.
[177] *Id.* Ex. 78, at JANCO-00129690.
[178] *Id.* Ex. 80, at ISS_000240992.
[179] *Id.* Ex. 45, at JANCO-00106741.
[180] ISS Br. 25 (citing Ex. 81, at ISS_000372817).
[181] Tunney Aff. Ex. 82, at JANCO-00157357.
[182] *Id.* Ex. 83, at ISS_000374994–95. *See also generally* JanCo Am. Compl. Ex. U3.
[183] Tunney Aff. Ex. 84, at JANCO-00041034, -40, -41;  Xu Aff. Ex. 142, at JANCO-00198528.
[184] Tunney Aff. Ex. 74, at JANCO-00198571 ("As a reminder, the FAA and Pima consents were not received in a timely manner pursuant to the specific terms of the APA (and even the extension we exchanged, but never executed[.])").

## D.    The Net Working Capital Dispute

JanCo agreed to a purchase price for the purchased assets of $80,000,000.00, subject to specific adjustments including a $5,000,000.00 holdback amount (the "Holdback Amount").[185]  The Holdback Amount

> [W]ill be reduced, but not below zero, by the amount of any Losses indemnifiable by [ISS] under Article 7 herein.  The remaining balance of the Holdback Amount, less any then pending claims against it by [JanCo], will be remitted to [ISS] within five (5) business days following the twelve (12) month anniversary of the Closing Date by wire transfer of immediately available funds in accordance with wire instructions to be provided by notice given by the intended recipient of the Holdback Amount.[186]

APA Section 2.5 governs the Working Capital Adjustment.  The parties agreed to a net working capital target of $12,877,000.00.[187]  JanCo was required to deliver to ISS, "within five (5) business days after the ninetieth (90th) day following the Closing Date, a statement (the 'Working Capital Statement') setting forth [JanCo's] determination of the actual net working capital of [ISS] on a consolidated basis as of the Closing Date (the 'Actual Closing Date Working Capital')."[188]  The APA detailed how the Working Capital Statement would be calculated, and permitted ISS to access JanCo's relevant books, records, and other documents "related to the preparation of the Working Capital Statement."[189]  The APA required:

---

[185] APA § 2.4.
[186] Id. (emphasis in original).
[187] Id. § 2.5(a).
[188] Id. § 2.5(b) (emphasis in original).
[189] Id.

30

If the Actual Closing Date Working Capital, as finally determined pursuant to this Section 2.5, is greater than the NWC Target by more than $100,000.00, then [JanCo] shall pay to [ISS], as an adjustment to the Purchase Price, the amount by which (A) Actual Closing Date Working Capital exceeds (B) the NWC Target plus $100,000.00, paid in accordance with Section 2.5(f).  If the Actual Closing Date Working Capital, as finally determined pursuant to this Section 2.5, is more than $100,000.00 less than the NWC Target, then [ISS] shall pay to [JanCo], as an adjustment to the Purchase Price, the amount by which (C) Actual Closing Date Working Capital is less than (D) the NWC Target minus $100,000.00, paid in accordance with Section 2.5(f).[190]

On March 1, 2022, JanCo sent its Net Working Capital Statement to ISS.[191]

On March 7, ISS expressed concerns over the calculations.[192]  The parties then discussed extending the timeline for deciding on the Net Working Capital amount.[193] The parties continued negotiating for several months.[194]  On March 21, ISS first proposed that the Net Working Capital calculation and the FAA consent are "outstanding processes [that] are interlinked, and given [ISS is] awaiting the final audited accounts from [JanCo], [ISS] believe[s] it makes sense to push out and close all this in one go."[195]

On July 20, 2022, the Head of Corporate Development at Argenbright, Tanmay Limaye ("Limaye"), informed Argenbright's CEO, Ishwar, that JanCo

---

[190] *Id.* § 2.5(e) (emphasis in original).
[191] Tunney Aff. Ex. 85, at JANCO-00126446–47.  *See generally* Xu Aff. Ex. 113.
[192] Tunney Aff. Ex. 86, at ISS_000236213.
[193] *See* Tunney Aff. Ex. 45, at JANCO-00106741; Ex. 87, at JANCO-00163465.
[194] *See generally id.* Exs., 88, 89, 90.
[195] Xu Aff. Ex. 114, at JANCO-00163465.

owed ISS $2.4 million.[196]  Ishwar responded "[c]an some of it be paid from the escrow on customers who have not been brought in . . . ?"[197]  On August 8, Limaye provided Ishwar with a "finalized NWC reconciliation" stating "[w]e effectively owe then $3MM for the additional AR they delivered, and we collected upon."[198]  This calculation included Pima County and the FAA as accounts that have been collected upon by Argenbright.[199]

On September 8, JanCo sent ISS an updated Net Working Capital statement which listed the Actual Closing Date Working Capital as $16,057,000.[200]  JanCo suggested a Net Working Capital total of $2.4 million in comparison to ISS's calculation of $3.4 million.[201]  According to JanCo, the difference in amounts was based on "payments demonstrated in the NWC statement that accrued through ISS's failure to make accounts receivable payments to ISS" including those from Ingram Micro and other accounts—a total of approximately $695,000.[202]  On October 4, ISS responded that its own calculations put the Net Working Capital at $16,366,000 and noted "[t]his brings total difference in Adjusted NWC between our analyses of USD

---

[196] Tunney Aff. Ex. 91, at JANCO-00155481.
[197] *Id.*
[198] *Id.* Ex. 92, at JANCO-00197921.
[199] *Id.* at JANCO-00197922; *Id.* Ex. 70, at 175:3–24.
[200] *Id.* Ex. 93, at JANCO-00041470, -73.
[201] Xu Aff. Ex. 115, at 1 (Ex. 115 was supplemented to the Court on May 23, 2024).  The Court notes that neither copy of Ex. 115 has bate stamps so the Court refers only to the page as it appears in the document file.
[202] JanCo Opp'n 5 (citing Xu Aff. Ex. 115).

309k."[203]   ISS shared their calculation explanation with JanCo, after request, on October 19.[204]  On October 25, JanCo emailed ISS and stated "[w]e agree with your base working capital calculation"[205] as to the $16,366,000 amount, but "there were two open items as noted in the email, the tablets and the incorrect insurance, which are part of that."[206]

The Net Working Capital amount has not been paid, and JanCo asserted that, like the consents, it is "subject to coming to agreement on all of the other issues resolved to our satisfaction."[207]  JanCo was "trying to reach a global compromise with ISS."[208]  ISS had agreed to make the other issues a "part of the puzzle to try and resolve everything[.]"[209]  JanCo's Vice President of Finance, Seth Higdon, stated that ISS's data "is horrendous.  I have never seen anything so—it was terrible."[210] JanCo also notes as evidence of bad data, that JanCo "recorded a non-cash write-off during the year ended December 31, 2022 in the amount of $3,554,694[.]"[211]

On November 23, 2022, JanCo submitted an indemnification claim seeking damages of approximately $10 million from ISS.[212]

---

[203] Tunney Aff. Ex. 94, at JANCO-00041078; Xu Aff. Ex. 116, at JANCO-00198576.
[204] Tunney Aff. Ex. 95, at JANCO-00118624.  *See also generally id.* Ex. 96.
[205] *Id.* Ex. 97, at JANCO-00118848.
[206] *Id.* Ex. 70, at 185:23–186:8.
[207] *Id.* Ex. 74, at JANCO-00198571.
[208] JanCo Opp'n 4–5 (citing Tunney Aff. Ex. 74, at JANCO-00198571).
[209] Xu Aff. Ex. 164, at 80:9–81:16.
[210] *Id.* 140, at 43:6–7.
[211] *Id.*. 162, at JANCO-00213097.
[212] *See generally* JanCo Am. Compl. Ex. V.

### E. The LaSalle Tax Receipts

JanCo bought cleaning equipment from non-party LaSalle Systems Leasing, Inc. ("LaSalle") which was paid for as part of the APA purchase price.[213] JanCo also agreed to pay post-acquisition taxes that ISS originally paid when acquiring the equipment.[214] In February 2022, ISS provided JanCo with the tax receipts indicating a total of $165,211.96.[215] JanCo repeatedly acknowledged its responsibility to pay the tax amount,[216] but has not yet paid this amount to ISS.[217] JanCo notes that "[b]oth parties have treated the tax payments related to this buyout as part of the NWC compromise."[218]

### F. The Employment Agreements

Pitcock, Bartlett, and Rivas were all subject to non-compete agreements and non-solicitation agreements.[219] The APA's covenant not to solicit read

> [ISS] agrees that for a period of three (3) years from and after the Closing Date, [ISS] and its Affiliates will not, directly or indirectly, whether as an owner, director, officer, employee, consultant or in any other capacity solicit for employment with [ISS] any person employed by [ISS] as of the Closing Date who is hired by [JanCo] and who provides services to the Target Accounts (other than through general

---

[213] APA, sched. 4.17; Amendment § 3.
[214] Amendment § 3.
[215] Tunney Aff. Ex. 98, at JANCO-00159835.
[216] *See, e.g.*, *id.* Ex. 70, at 163:4–8; Ex. 85, at JANCO-00126446–47.
[217] ISS Br. 29.
[218] JanCo Opp'n 19 (citing Xu Aff. Ex. 155, at JANCO-0019851; Ex. 145, at JANCO-00163429; Ex. 146, at JANCO-00198603).
[219] Xu Aff. Ex. 150, §§ 4, 6 (Ex. 150 was supplemented to the Court on May 23, 2024). JanCo cites only to Pitcock's signed agreement in briefing. JanCo Opp'n 20.

solicitations which are not directed to specific individuals or companies).[220]

Prior to JanCo's acquisition, Pitcock served as ISS's VP of its Cleaning Division.[221] On July 1, 2022, Pitcock joined JanCo as Vice President of Operations.[222] Pitcock was responsible for trying to set up an account with IKEA for JanCo.[223] JanCo terminated Pitcock on October 11, 2022 while JanCo was losing customers and the "performance of the business was not very good" which would have been Pitcock's responsibility.[224] ISS ended up obtaining the IKEA account, and Pitcock was hired back by ISS on December 1, 2022 to replace the ISS's IKEA account leader who had recently resigned.[225]

JanCo is skeptical that Pitcock ever intended to bring the IKEA account to JanCo, and instead JanCo believes Pitcock sought to maintain the IKEA relationship to bring it back to ISS.[226] After Pitcock left JanCo, JanCo's "entire conversation [with IKEA] just stopped."[227] JanCo never entered into a contract with IKEA.[228]

---

[220] APA § 5.5(b).
[221] JanCo Opp'n 19 (citing "Argenbright Dep. 47:15"). The Court notes JanCo did not direct the Court to any exhibit for this citation, and only two exhibits contains portions of the Argenbright Deposition, but it does not include page 47.
[222] JanCo Am. Compl. ¶ 138.
[223] *See* Xu Aff. Ex. 123, at 84:10–12; Ex. 163, at 107:17–108:15.
[224] *Id.* Ex. 118, at 205:4–13.
[225] JanCo Am. Compl. ¶ 139; ISS Answer to Am. Compl. ¶ 139; Tunney Aff. Ex. 102, at 245:20–21; 247:21–22.
[226] JanCo Opp'n 21 (citing Ex. 126, at 223:5–19; Ex. 163, at 107:22–108:8).
[227] Xu Aff. Ex. 118, at 207:23–208:4.
[228] *Id.* Ex. 126, at 225:4–6.

JanCo is also skeptical of ISS's employee, Jorgensen, and Pitcock's relationship because they met in 2017 and Pitcock was one of Jorgensen's direct reports.[229] The two saw each other monthly at business reviews.[230] During the transition period of the APA, the two spoke bi-weekly to "discuss elements of support needed and approval of consents to assign[.]"[231] Jorgensen and Pitcock also had weekly standing meetings for a "regular update."[232] JanCo noted that both Jorgensen and Pitcock admitted their conversations would span beyond work-related topics to include current events and travel interests.[233]

Pitcock contacted ISS about returning to work on the same day he was terminated by JanCo; he returned to ISS in December 2022.[234] According to Jorgensen, who was "directly involved with the hiring of Jason," Pitcock was hired back with ISS specifically to manage the IKEA account.[235] Jorgensen noted that she was the one who informed Pitcock that ISS had a "resignation of the key account leader" for IKEA and inquired if Pitcock would be interested in the role.[236] Between

---

[229]*Id.* Ex. 123, at 26:10–11; 65:13–16.
[230] *Id.* at 69:16–19.
[231] *Id.* Ex. 138, at 21.
[232]*Id.* Ex. 123, at 74:7–10.
[233] JanCo Opp'n 23–24 (citing Ex. 123, at 79:10–17; Ex. 126, at 246:8–13; 247:7–17).
[234] Tunney Aff. Ex. 102, at 244:22–245:21; Ex. 103, at 81:5–20; 82:20–83:8.
[235] Xu Aff. Ex. 123, at 97:15–16; 176:11–15.
[236] *Id.* Ex. 126, at 247:7–13.

July and August 2022, before Pitcock was terminated by JanCo, Jorgensen and Pitcock spoke six times and had three calls on the day he was terminated.[237]

On December 7, 2022, JanCo sent ISS a cease and desist letter alleging that Pitcock violated his non-compete.[238] JanCo's CEO, Ishwar, asserts Pitcock reached out to him to discuss the letter, and in that conversation—which Ishwar recorded—Pitcock challenged JanCo with "dirt" he had on JanCo, as a way to stop JanCo from enforcing the non-compete.[239]

Bartlett worked for JanCo as regional manager for the southeast region from July 1, 2022, through December 16, 2022.[240] Bartlett resigned from JanCo because of "many unethical practices" and "a serious lack of integrity."[241] JanCo challenged Bartlett's resignation letter as relying on information Pitcock must have provided her, because only Pitcock could have known that information.[242] This accusation, however, was made by someone who admitted he "wasn't in the room" when these characterizations were made, he was just "informed kind of by some of the people about some of the conversations that were going on and what was said."[243] Bartlett testified she learned of the unethical and illegal conduct from JanCo's president.[244]

---

[237] *Id.* Ex. 138, at 21–22.
[238] *See generally id.* Ex. 148.
[239] *Id.* Ex. 118, at 214:1–25.
[240] *Id.* Ex. 139, at 25:1–6.
[241] Tunney Aff. Ex. 104, at JANCO-00003247.
[242] Xu Aff. Ex. 140, at 178:17–179:25.
[243] Masi Aff. Ex. B, at 179:19–180:3.
[244] *Id.* Ex. C, at 53:8–68:21.

After resigning and taking several months off, Bartlett reached out to ISS for employment.[245]  In the time between her resignation and returning to ISS, she had multiple conversations with Pitcock, including about how his return to ISS had been.[246]  Pitcock conducted Bartlett's interview when she returned to ISS.[247]

JanCo also asserts that ISS violated the contracts by soliciting Rivas from JanCo.[248]  On October 25, 2022, Rivas submitted his resignation to JanCo "to accept another job offer."[249]  Pitcock, however, was of the impression that Rivas also left JanCo, *then* reached out to ISS about opportunities.[250]  Rivas, like Pitcock and Bartlett, all omitted from their LinkedIn profiles that they ever worked for JanCo.[251] Bartlett stated this was because she did "not want to be associated with those crooks."[252]

JanCo's John Maynord declined to answer, deferring to counsel, about what evidence JanCo had indicating that ISS solicited employees or induced the employees to breach their respective contracts.[253]

---

[245] Tunney Aff. Ex. 106, at 25:19–26:13.
[246] Xu Aff. Ex. 139, at 28:3–29:21.
[247] *Id.* at 26:21–24.
[248] JanCo Opp'n 27.
[249] Xu Aff. Ex. 161.
[250] Tunney Aff. Ex. 103, at 172:16–25.
[251] JanCo Opp'n 27; Xu Aff. Ex. 123, at 172:11–24.
[252] Masi Aff. Ex. C, 27:6–7
[253] Tunney Aff. Ex. 107, at 224:12–225:24; 228:12–229:12.

## II.    PROCEDURAL HISTORY

The legal proceedings between these parties began in the Court of Chancery on December 27, 2022, when ISS filed a Complaint against JanCo.[254]  ISS moved to dismiss for lack of equitable jurisdiction under Court of Chancery Rule 12(b)(1).  Concurrent to briefing the motion, on March 3, 2023, JanCo filed a Complaint in the Superior Court of Delaware.[255]  On June 20, 2023, Vice Chancellor Glasscock granted JanCo's motion to dismiss the Complaint in Chancery, with leave to transfer to Superior Court subject to 10 *Del. C.* § 1902.  Vice Chancellor Glasscock granted the transfer to the Complex Commercial Litigation Division on July 6, 2023.  On July 7, ISS filed its transferred Complaint in Superior Court.[256]  On September 26, 2023, this Court granted an Order of Consolidation, consolidating N23C-07-036 MAA CCLD and N23C-03-005 MAA CCLD.[257]

On November 7, 2023, ISS filed an Amended Complaint asserting five counts:[258] (I) Breach of Contract (Failure to Provide Escrow Instructions);[259] (II) Unjust Enrichment (in the Alternative to Count I);[260] (III) Breach of the Implied

---

[254] *ISS Facility Servs. Inc. v. JanCo FS 2, LLC*, 2022-1197-SG.
[255] *JanCo FS 2, LLC v. ISS Facility Servs., Inc.*, C.A. N23C-03-005-AML CCLD.  On May 11, 2023, the case was reassigned to Judge Adams after then-Judge LeGrow was appointed to Justice of the Supreme Court of Delaware.  D.I. 65.
[256] *ISS Facility Servs., Inc. v. JanCo FS 2, LLC*, C.A. N23C-07-036 MAA CCLD.
[257] N23C-03-005 MAA CCLD, D.I. 104; N23C-07-036 MAA CCLD, D.I. 3.  All D.I. references hereafter will refer to the consolidated docket at N23C-03-005 MAA CCLD.
[258] D.I. 128.
[259] *Id.* ¶¶ 75–80.
[260] *Id.* ¶¶ 81–87.

Covenant (in the Alternative to Count I);[261] (IV) Breach of Contract (Failure to Pay Working Capital Adjustment and Purchase Price Adjustments);[262] and (V) Declaratory Judgment.[263] On November 21, 2023, JanCo filed an Answer and Affirmative Defenses to ISS's Amended Complaint.[264]

On November 22, 2023, JanCo filed an Amended Complaint alleging eight counts:[265] (I) Fraud/Intentional Misrepresentation;[266] (II) Indemnification for Breaches of Representations and Warranties;[267] (III) Breach of Transition Services Agreement;[268] (IV) Declaratory Judgment (Declaring Escrow Funds Relating to FAA and Pima County to be Released to Purchasers);[269] (V) Breach of Duty of Good Faith and Fair Dealing (Escrow Funds Relating to Ingram Micro);[270] (VI) Indemnification for Excluded Liability and Breach of Representation and Warranty (Avnet);[271] (VII) Breach of Asset Purchase Agreement (Covenant Not to Solicit);[272] and (VIII) Intentional Interference with Contractual Relations.[273] On December 8,

---

[261] *Id.* ¶¶ 88–94.
[262] *Id.* ¶¶ 95–01.
[263] *Id.* ¶¶ 102–06.
[264] D.I. 133.
[265] D.I. 134.
[266] *Id.* ¶¶ 207–26.
[267] *Id.* ¶¶ 227–42.
[268] *Id.* ¶¶ 243–45.
[269] *Id.* ¶¶ 246–50.
[270] *Id.* ¶¶ 251–59.
[271] *Id.* ¶¶ 260–64.
[272] *Id.* ¶¶ 265–68.
[273] *Id.* ¶¶ 269–76.

2023, ISS filed an Answer and Affirmative Defenses to JanCo's Amended Complaint.[274]

On March 29, 2024, both ISS and JanCo filed motions for summary judgment.[275] On April 26, 2024, the parties filed their opposition briefs to each other's motions.[276] On May 9, 2024, the parties filed their reply briefs.[277] The Court heard oral argument on both motions on May 23, 2024 and reserved decision.[278]

## III.   STANDARD OF REVIEW

The standard on a motion for summary judgment is well settled. Delaware Superior Court Rule 56(c) instructs that the "judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[279] A genuine dispute about a material fact is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[280]

---

[274] D.I. 140.
[275] D.I. 156; 159.
[276] D.I. 169; 171.
[277] D.I. 177; 179.
[278] D.I. 183.
[279] Super. Ct. Civ. R. 56(c).
[280] *Gateway Ests., Inc. v. New Castle Cty.*, 2015 WL 13145613, at *13 (Del. Super. Sept. 29, 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986)) (internal quotation marks omitted).

The burden is on the moving party to show the undisputed facts support its position.[281] Once the burden is met, the burden shifts to the nonmoving party to "show that there are material issues of fact the ultimate fact-finder must resolve."[282] A court will not grant summary judgment if "it appears that there is a material fact in dispute or that further inquiry into the facts would be appropriate."[283] The moving party's claim must be "based on more than mere speculation."[284]

When the parties have filed cross-motions for summary judgment, as is the case for some of the claims here, "the standard for summary judgment 'is not altered.'"[285] If "neither party argues the existence of a genuine issue of material fact, 'the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the[m].'"[286] However, even where cross-motions are filed, if "an issue of material fact exists, summary judgment is not appropriate."[287]

---

[281] *Olga J. Nowak Irrevocable Tr. v. Voya Fin'l Inc.*, 2020 WL 7181368, at *3 (Del. Super. Nov. 30, 2020) (citing *Moore v. Sizemore*, 405 A.2d 679, 681 (Del. 1979)).

[282] *Id.* (citing *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995)).

[283] *Capano v. Lockwood*, 2013 WL 2724634, at *2 (Del. Super. May 31, 2013) (citing *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962)).

[284] *Pazuniak L. Off., LLC v. Pi-Net Int'l, Inc.*, 2016 WL 3916281, at *2 (Del. Super. July 7, 2016).

[285] *Capano*, 2013 WL 2724634, at *2 (quoting *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1050 (Del. Super. 2001)) (internal quotation marks omitted).

[286] *Radulski v. Liberty Mut. Fire Ins. Co.*, 2020 WL 8676027, at *4 (Del. Super. Oct. 28, 2020) (quoting Del. Super. Ct. Civ. R. 56(h)).

[287] *Motors Liquid. Co. DIP Lenders Tr. v. Allianz Ins. Co.*, 2017 WL 2495417, at *5 (Del. Super. June 8, 2017) (citing *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1029 (Del. Ch. 2008)).

## IV. ANALYSIS

### A. The Parties' Contentions

#### 1. JanCo's Motion for Summary Judgment

JanCo moves for summary judgment on four of ISS's counts: Count I (breach of contract for failure to provide escrow instructions); Count II (unjust enrichment); Count III (breach of the implied covenant); and Count V (declaratory judgment and claims relating to the Holdback Amount).[288]

For Count I, JanCo argues that JanCo was not obligated, or even authorized, to instruct the escrow agent to release the funds once the 120-day consent period had passed based on the APA's "abundantly clear" Section 6.1(d).[289] Two of the consents, the FAA and Pima County, were obtained after the 120-day deadline, and thus, JanCo had no obligation to instruct the escrow agent.[290] ISS's reading of the contract is incorrect because it "would require the Court to (1) entirely ignore ISS's contractual obligations to timely provide the consents and (2) impose a non-existent obligation upon JanCo that ISS never bargained for."[291]

JanCo asserts that ISS's unjust enrichment claim cannot proceed because "valid contract terms squarely govern."[292] JanCo further argues ISS cannot plead in

---

[288] JanCo Br. 1.
[289] *Id.* 10.
[290] *Id.* 11.
[291] *Id.* 12.
[292] *Id.* 14.

the alternative because ISS has not alleged the APA is an invalid or unenforceable contract.[293] JanCo similarly argues the APA "language controls and leaves no gap to fill" so ISS's implied covenant claim must be dismissed.[294] Nor did JanCo engage in any "oppressive or underhanded tactics" that the Court could determine violated an implied covenant.[295]

JanCo moves to dismiss Count V for two reasons. First, ISS has no claim to the Holdback Amount because APA Section 2.4(b) reduces the amount by pending claims and JanCo had pending claims so no payment was due.[296] Second, ISS is not entitled to declaratory judgment because the claim is "overripe" and "duplicative of other claims in this litigation."[297] The Court should dismiss the claim because the declaration is based on the "very same indemnification claims that are asserted in JanCo's Amended Complaint" and thus the Court will already address these issues elsewhere.[298]

ISS disputes JanCo's breach of contract argument on two main grounds. First, ISS asserts JanCo's "interpretation of the APA is unreasonable in light of the parties' intent embodied in the entire agreement and in the contracts ancillary to the APA—

---

[293] *Id.* 14–16.
[294] *Id.* 16–20.
[295] *Id.* 20–21.
[296] *Id.* 22–23.
[297] *Id.* 23.
[298] *Id.* 24.

particularly the Escrow Agreement."[299]  ISS claims that "[a]t minimum, the APA's silence on the disposition of consents delivered more than 120 days post-Closing evinces an ambiguity or a contractual gap[.]"[300]  Second, even if the Court adopts JanCo's interpretation, JanCo "amended and/or waived the 120-day window."[301] ISS argues JanCo's conduct evidences a waiver or at the very least, ISS's affirmative defenses of waiver, estoppel, and acquiescence should be considered fact questions.[302]

ISS reinforces that its unjust enrichment and implied covenant claims are permissible alternative claims "based on potential gaps in the parties' contracts."[303]

As to Count V, ISS argues the overlapping claims "rise and fall together."[304] JanCo's overripeness arguments are inadequately briefed because JanCo failed to argue the seven factors established in prior case law.[305]  JanCo's duplicative arguments are insufficient because the Court can deal with all related issues at trial without any additional burden.[306]

---

[299] ISS Opp'n 23.
[300] *Id.* 25.
[301] *Id.*
[302] *Id.* 27.
[303] *Id.* 30–36.
[304] *Id.* 36.
[305] *Id.* 37–38 (citing *CRE Niagara Hldgs., LLC v. Resorts Grps., Inc.*, 2023 WL 2625838, at *8–10 (Del. Super. Mar. 24, 2023)).
[306] *Id.* 37–38.

JanCo responds that Section 6.1(d) "plainly ties the timely delivery of the consents to who receives the escrowed funds."[307] ISS's approach ignores ISS's contractual obligation to continue to use "best efforts" to obtain the consents, irrespective of the deadline.[308] JanCo notes that "only by ignoring [the best efforts requirements] can ISS misleadingly contend" there is a gap to be filled.[309] Even if JanCo waived or amended the 120-day deadline—which JanCo disputes—the consents were still received *after* the contemplated extension.[310]

JanCo emphasizes that dismissing "ISS's entirely duplicative claim for a declaratory judgment about who is entitled to the holdback will streamline and simplify the trial."[311]

### 2. *ISS's Motion for Summary Judgment*

ISS moves for summary judgment on ISS's Count I (breach of contract for failure to provide escrow instructions) and Count IV (breach of contract for failure to pay working capital adjustment and purchase price adjustments).[312] ISS also moves for summary judgment on JanCo's Count IV (declaratory judgment); Count V (breach of duty of good faith and fair dealing); Count VII (breach of the asset

---

[307] JanCo Reply 4.
[308] *Id.* 5–7.
[309] *Id.* 7–8.
[310] *Id.* 8–9.
[311] *Id.* 26.
[312] ISS Br. 4.

purchase agreement); and Count VIII (intentional interference with contractual relations).[313]

Regarding Count I, ISS asserts it is entitled to the Purchase Price Adjustments for three accounts: Ingram Micro, FAA, and Pima County.[314] ISS argues it is entitled to the Ingram Micro payment because the consent was obtained within the deadline, and ISS is not responsible for Ingram Micro's subsequent decision to terminate its relationship with JanCo.[315] ISS suggests Count I is tied into JanCo's Count V because JanCo argues ISS allegedly "knew the business was effectively lost but withheld that information" from JanCo.[316] ISS advances, however, that "the record refutes this claim."[317]

ISS argues for summary judgment of ISS's Count I for the FAA and Pima County consents despite missing the deadlines for two reasons. First, the APA requires payment for any consent obtained, regardless of the deadlines, because the alternative—JanCo obtaining the accounts without payment—"would be inequitable and absurd."[318] Second, JanCo amended and/or waived the APA's deadline for the

---

[313] *Id.*
[314] *Id.* 33.
[315] *Id.*
[316] *Id.* 33–34.
[317] *Id.* 34–35.
[318] *Id.* 35–36.

consents by signing multiple agreements to extend the deadline, and waiving the deadline through its subsequent conduct.[319]

As to ISS's Count IV, ISS asserts that ISS is entitled to the Working Capital Adjustment pursuant to APA Section 2.5(e).[320] JanCo's attempt to avoid paying the Working Capital Adjustment "by attempting to tie that payment to other unresolved issues between the parties" is not supported by the APA or Delaware law.[321] ISS similarly argues it is entitled to the tax liabilities for the LaSalle Equipment pursuant to APA Section 3.[322]

ISS jointly argues that JanCo's Counts VII and VIII fail as a matter of law, and thus summary judgment should be granted for ISS.[323] ISS contends the evidence disputes JanCo's allegations that ISS solicited several employees[324] and further cannot satisfy the elements for tortious interference.[325]

JanCo disputes its obligation to pay the Net Working Capital adjustment because APA Section 2.5(e) requires a final determination as to the amount first which the parties never reached.[326]

---

[319] *Id.* 36–38.
[320] *Id.* 31.
[321] *Id.* 32.
[322] *Id.* 32–33.
[323] *Id.* 38.
[324] *Id.* 39–40.
[325] *Id.* 40–41.
[326] JanCo Opp'n 28–30.

48

As to the consent issues, JanCo emphasizes ISS is not entitled to the FAA and Pima County amounts because they were obtained past the deadline.[327] Ignoring the clear language of APA Section 4.6 would "(1) entirely ignore ISS's contractual obligations to timely provide the consents and (2) impose a non-existence obligation upon JanCo that ISS never bargained for."[328] To say the outcome is "absurd" or "outrageous" ignores the fact that sophisticated parties bargained for these terms; JanCo encourages the Court to follow Delaware's well-established law and interpret the contract by its plain terms.[329] JanCo further argues ISS's waiver argument ignores the APA's clear requirements for waiver that have not been met.[330]

Regarding Ingram Micro, JanCo asserts summary judgment should not be granted for either party because there remains a fact issue about the amount owed because JanCo did not receive all of Ingram Micro's business.[331] JanCo's own Count V is tied to this fact issue, challenging ISS's alleged failure to inform JanCo about Ingram Micro's divestment to CEVA.[332]

JanCo also argues JanCo's Count VII and VIII have remaining factual disputes that preclude summary judgment.[333] JanCo disagrees with ISS's

---

[327] *Id.* 30.
[328] *Id.* 31.
[329] *Id.* 32–33.
[330] *Id.* 34.
[331] *Id.* 34.
[332] *Id.* 34–36.
[333] *Id.* 37.

characterization of the facts as "ignor[ing] the larger context of the events,"[334] improperly asking the Court to make credibility determinations,[335] and failing to acknowledge factual discrepancies.[336]

ISS notes that "JanCo concedes that, after additional discussions between the parties, JanCo told ISS on November 8, 2022 that JanCo was 'in agreement on the amount of the NWC' of $16.36 million" and this should end the inquiry.[337] ISS contends that the APA's Net Working Capital provision is stand-alone and not implicated by other calculations or unresolved issues by the parties.[338] Any alleged disputes arose after the APA and ISS argues they should not be considered.[339]

Regarding Ingram Micro, ISS notes that the implied covenant of good faith is a "cautious enterprise" and unsupported by JanCo's claims.[340] By agreeing that the consent for Ingram Micro was obtained timely, no fact dispute exists.[341] JanCo's allegations that ISS failed to disclose information about Ingram Micro in a timely manner is not an *implied* issue because correspondence pertaining to Target Accounts is encompassed in APA Section 5.17(b).[342] As to the FAA and Pima

---

[334] *Id.* 37–38.
[335] *Id.* 38–39.
[336] *Id.* 39.
[337] ISS Reply 1–2.
[338] *Id.* 3.
[339] *Id.* 4–5.
[340] *Id.* 6–7.
[341] *Id.*
[342] *Id.* 9.

County consents, ISS argues "[w]hether framed as an amendment or a waiver, the unrebutted contemporaneous record demonstrates that the parties were in agreement that the 120-day period did not apply[.]"[343]

ISS lastly argues it should obtain summary judgment on JanCo's Count VII and VIII because the evidence fails to support either claim and JanCo has not alleged any harm resulting from the claims.[344]

## B.     The Consents and Entitlement to the Adjustment Amounts

### 1.     *FAA and Pima County*

a.     JanCo's Motion as to ISS's Count II, Unjust Enrichment, is Granted.

i.     *The Law on Unjust Enrichment*

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[345]  The elements are "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, [and] (4) the absence of justification."[346]  Commonly referred to as a threshold

---

[343] *Id.* 11–14.
[344] *Id.* 15–22.
[345] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)) (internal quotation marks omitted).
[346] *Chumash Cap. Inves., LLC v. Grand Mesa P'rs, LLC*, 2024 WL 1554184, at *14 (Del. Super. Apr. 10, 2024) (quoting *CFGI, LLC v. Common C Hldgs. LP*, 2024 WL 325567, at *6 (Del. Super. Jan. 29, 2024)) (internal quotation marks omitted).

question,[347] the Court must also consider that this cause of action "is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim."[348] This means that "if '[t]he contract is the measure of [the plaintiff's] right, there can be no recovery under an unjust enrichment theory independent of it.'"[349]

Unjust enrichment and breach of contract can be pled in the alternative only when "there is doubt surrounding [the relevant contract's] enforceability or . . . existence."[350] Alternative pleading, however, "does not obviate the obligation to provide factual support for each theory."[351] Pleading in the alternative merely as a safe strategy is insufficient; "just because an enforceable contract may not provide the relief a litigant wants does not mean its case is 'not controlled by the contract.'"[352]

---

[347] *See, e.g.*, *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58 (Del. Ch. 2012) (citing *MetCap Secs. LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *19 (Del. Ch. May 16, 2007)).
[348] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009).
[349] *Chumash*, 2024 WL 1554184, at *16 (quoting *Kuroda*, 971 A.2d at 891) (internal quotation marks omitted).
[350] *Intermec IP Corp. v. TransCore, LP*, 2021 WL 3620435, at *17 (Del. Super. Aug. 16, 2021) (quoting *Khushaim v. Tullow Inc.*, 2016 WL 3594752, at *8 (Del. Super. June 27, 2016)) (internal quotation marks omitted).
[351] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *8 (Del. Ch. Feb. 3, 2009).
[352] *Intermec IP Corp.*, 2021 WL 3620435, at *17) (citing *S'holder Rep. Servs. LLC v. RSI Holdco, LLC*, 2019 WL 2207452, at *6 (Del. Ch. May 22, 2019)).

Another exception is if "it is the [contract], itself, that is the unjust enrichment," then the claims can proceed together.[353]  Stated differently, unjust enrichment is not duplicative of a breach of contract claim "where the claim is premised on an allegation that the contract arose from wrongdoing (such as . . . fraud) or mistake and the [defendant] has been unjustly enriched by the benefits flowing from the contract."[354]

Despite pleading in the alternative, a plaintiff can only recover once, so if both claims proceed to trial, the finder of fact may provide a remedy for the breach of contract claim, and decline to award relief for an unjust enrichment claim when the contract governs the relationship.[355]  When "[t]here is no benefit to be gained . . . from delving into the alternative theories to assess how they may interact" the unjust enrichment claim can be dismissed.[356]

### ii. The Contract Entirely Governs the Consent Issues.

Both parties agree the APA is a valid and enforceable contract.[357]  ISS seeks to avoid dismissal of its unjust enrichment claim because "the APA did not explicitly

---

[353] *LVI Grp Invs., LLC v. NCM Grp. Hldgs., LLC*, 2018 WL 1559936, at *16 (Del. Ch. Mar. 28, 2018) (quoting *McPadden v. Sidhu*, 964 A.2d 1262, 1276 (Del. Ch. 2008)) (internal quotation marks omitted).

[354] *Chumash*, 2024 WL 1554184, at *16 (quoting *LVI Grp. Invs., LLC*, 2018 WL 1559936, at *16) (internal quotation marks omitted).

[355] *See Garfield on behalf of ODP Corp., v. Allen*, 277 A.3d 296, 361 (Del. Ch. 2022) (citing *ID Biomedical Corp. v. TM Techs., Inc.*, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995)).

[356] *Id.* at 361–62.

[357] JanCo Br. 14 (citing ISS Am. Compl. ¶ 76; JanCo Am. Compl., Ex. C).  *See also* JanCo Am. Compl. ¶ 228.

53

cover the circumstances that emerged—the 120-day post-Closing period ended, the parties continued to work together to obtain the Unobtained Required Consents, [ISS] later secured those consents, and [JanCo] accepted the accounts."[358] ISS therefore does not rely on either alternative pleading exception; if ISS succeeds, it must be because the Court finds the APA does not cover the conduct challenged.

The Court determines the APA governs the entire relationship between the parties as it relates to the consents. Section 5.17 requires ISS to "continue to use their commercially reasonable efforts" to obtain the consents for JanCo.[359] Section 5.19 also requires the parties to "work cooperatively and in good faith" to obtain the consents "both before and after the Closing Date."[360] Section 6.1(d) of the APA, in extensive detail, outlines ISS's obligation to obtain the consents before the Closing, after Closing, and the consequences for failure to obtain such consents within the prescribed time period.[361]

ISS pursuing unjust enrichment "[i]n the event the Court finds that [ISS] cannot recover the escrow funds under the APA or the APA Amendment for breach of contract as alleged in Count I"[362] is insufficient to survive summary judgment. ISS has failed to establish how multiple requirements of "good faith" efforts

---

[358] ISS Opp'n 32.
[359] APA § 5.17(c).
[360] *Id.* § 5.19(a).
[361] *See id.* § 6.1(d).
[362] ISS Am. Compl. ¶ 82.

throughout and after Closing do not comprehensively govern the obligations ISS may have had to continue to obtain the consents. As to this count, it is immaterial whether the Court finds merit in the other claims surrounding the consents; the fact that the APA outlines the procedure for obtaining consent is sufficient to encompass the parties' obligations. Pleading unjust enrichment as a "just in case" to ensure recovery is not appropriate; ISS is bound to the contract terms it agreed to. JanCo's motion for partial summary judgment as to ISS's Count II is therefore **GRANTED**.

b. <u>JanCo's Motion as to ISS's Count III, Implied Covenant, is Granted.</u>

i. *The Law on the Implied Covenant of Good Faith and Fair Dealing*

The implied covenant of good faith and fair dealing is "'inherent in all contracts' and ensures that parties do not 'frustrat[e] the fruits of the bargain' by acting 'arbitrarily or unreasonably.'"[363] To succeed on the claim, a plaintiff must establish "a specific implied contractual obligation, breach of that obligation by the defendant, and resulting damage to the plaintiff."[364] "Good faith" has been interpreted to mean a "wide range of heterogeneous forms of bad faith."[365] The implied covenant "requires 'a party in a contractual relationship to refrain from

---

[363] *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (Del. 2022) (quoting *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017)).

[364] *Id.* at 1117–18 (quoting *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020)) (internal quotation marks omitted).

[365] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (internal citations omitted).

arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' [sic] of the bargain.'"[366] The purpose of the implied covenant is to "enforce the parties' contractual bargain by implying terms that the parties would have agreed to during their original negotiations if they had thought to address them."[367]

The covenant, however "cannot properly be applied to give the plaintiffs contractual protections that 'they failed to secure for themselves at the bargaining table.'"[368] If the contract addresses the conduct challenged by the implied covenant, then the implied covenant does not apply.[369] A court thus "must first engage in the process of contract construction to determine whether there is a gap that needs to be filled."[370] The implied covenant cannot "infer language that contradicts a clear exercise of an express contractual right."[371]

Notably, "[n]ot all gaps should be filled."[372] The implied covenant should not be used "for rebalancing economic interests after events that could have been

---

[366] *Kuroda*, 971 A.2d at 888 (quoting *Dunlap*, 878 A.2d at 442).
[367] *ArchKey Intermediate Hldgs. Inc. v. Mona*, 302 A.3d 975, 1003 (Del. Ch. 2023).
[368] *Winshall v. Viacom Intern., Inc.*, 76 A.3d 808, 816 (Del. 2013) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1260 (Del. 2004)).
[369] *See Nationwide Emerging Mgrs., LLC v. Northpointe Hldgs., LLC*, 112 A.3d 878, 896 (Del. 2015) (citing *Dunlap*, 878 A.2d at 441).
[370] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014) (internal citations omitted).
[371] *Nemec*, 991 A.2d at 1127.
[372] *Allen*, 113 A.3d at 183.

anticipated, but were not, that later adversely affected one party to a contract."[373] The implied covenant is referred to as a "cautious enterprise" because it "infer[s] contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."[374] A court cannot allow the implied covenant to "re-write the agreement between the parties, and 'should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'"[375] The covenant should not serve "as a backstop to imply terms that parties failed to include but which could easily have been drafted."[376] The implied covenant is a "limited and extraordinary legal remedy."[377]

> ii. *There is No Gap to be Filled in the APA or the Amendment.*

The reasoning the Court applies here mirrors that of ISS's Count II:[378] the APA and the Amendment entirely governs the parties' relationship and obligations relating to the consents. The Court declines to find any gap the implied covenant can fill, nor does the record thus far reflect that JanCo engaged in such "oppressive or underhanded tactics"[379] that would go beyond the reasonable expectations of the

---

[373] *Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 457 (Del. Ch. 2023) (quoting *Nemec*, 991 A.2d at 1128) (internal quotation marks omitted).

[374] *Nemec*, 991 A.2d at 1125 (citing *Dunlap*, 878 A.2d at 441).

[375] *Nationwide Emerging Mgrs*., 112 A.3d at 897 (quoting *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006)).

[376] *Baldwin*, 283 A.3d at 1117 (citing *Nationwide Emerging Mgrs., LLC*, 112 A.3d at 897).

[377] *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021) (quoting *Nemec*, 991 A.2d at 1128).

[378] *See supra* Section IV. B. 1. a.

[379] ISS Am. Compl. ¶ 90.

parties. ISS's attempt to again plead, *in case* its breach claim fails, is not supported by law on the implied covenant.[380]

The APA outlines the procedures for obtaining the consents, and how the escrow funds are to be distributed depending on if and when the consents are obtained by the agreed-to deadline.[381] Several provisions require the parties to engage in "good faith" or with "commercially reasonable efforts" including while attempting to obtain the consents.[382] *What* the parties were required to do, and *how* they were supposed to do it is defined by the APA. The Amendment only reinforces these requirements noting the parties "agree to continue to use their best efforts following Closing to obtain such consents"[383] without noting an end date for those continued best efforts. If the parties wanted an end date, they should have contracted for one; instead, the plain reading of the Amendment reinforces that ISS had an obligation to continue seeking the consents, rather than JanCo "inducing" ISS to do so.[384] There is no contractual gap the implied covenant can fill; the APA and the Amendment entirely governs the parties relationship.

---

[380] *See* id. ¶ 89 ("In the event the Court finds that [ISS] cannot recover the escrow funds under the APA or the APA Amendment for breach of contract as alleged in Count I, [JanCo has] breached the implied covenant of good faith and fair dealing for which [ISS is] entitled to recover [its] damages.").

[381] APA § 6.1(d).

[382] *See, e.g.*, *id.* §§ 5.17(c); 5.19(a); 6.1(d).

[383] Amendment § 8.

[384] *See* ISS Am. Compl. ¶ 92.

ISS's argument that JanCo engaged in "oppressive or underhanded tactics" is equally unavailing. As an initial matter, at the summary judgment stage, it is not enough to just plead an assertion; a party must demonstrate evidence in the record to support its claim.[385] ISS disagrees with JanCo's assertion that the record does not establish "oppressive or underhand tactics" but provides no citation to the record to show where such tactics can be found.[386] There are approximately 200 exhibits in the record supplied between both parties, give or take some duplicates, and several depositions were taken for each side. If there is evidence in the record to show JanCo's oppressive or underhanded tactics, ISS has the burden to demonstrate them through citation or explanation. ISS also omitted discussion of this claim at oral argument, reinforcing that the record has not uncovered "oppressive" or "underhanded" behavior. The Court will not go looking for evidence in the record *for* ISS; inferences in favor of the non-moving party must be reasonable.[387]

The Court, therefore, **GRANTS** JanCo's motion for summary judgment as to ISS's Count III. Any question as to JanCo's conduct surrounding the consents is covered entirely by the contract and is dealt with by the Court's analysis below.

---

[385] *See, e.g.*, *KT4 P'rs LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at *11 (Del. Super. June 24, 2021) (noting that the movant bears the initial burden to show there are no genuine issues of material facts, then the burden shifts to the non-moving party to show there are disputed facts).
[386] ISS Opp'n 35.
[387] *See, e.g.*, *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 241 (Del. 2009) ("The facts, and all *reasonable* inferences, must be considered in the light most favorable to the non-moving party.") (emphasis added) (internal citations omitted).

c. **JanCo is entitled to the Adjustment Amounts for the FAA and Pima County because the Consents were Untimely.**

i. *The Law on Contract Interpretation*

Delaware law on contract interpretation is well-settled. Delaware courts apply the objective theory of contracts, "*i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party."[388] The court, when interpreting a contract, gives "'priority to the parties' intentions as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions."[389] The court "must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument."[390] A court applies the contract's "ordinary meaning" such that "a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[391]

When interpreting a contract, courts look at the terms "'as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage,' and 'will not read a contract to render a provision or term

---

[388] *N. Am. Leasing, Inc. v. NASDI Hldgs., LLC*, 276 A.3d 463, 467 (Del. 2022) (quoting *Salamone v. Gorman*, 106 A.3d 354, 367 (Del. 2014)).

[389] *Salamone*, 106 A.3d at 368 (quoting *GMG Cap. Inv., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[390] *ArchKey Intermediate Hldgs.*, 302 A.2d at 988 (quoting *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998)) (internal quotation marks omitted).

[391] *GMG*, 36 A.3d at 780 (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)) (internal quotation marks omitted).

meaningless or illusory.'"[392]  If the contract is "plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[393]  Courts do not look to extrinsic evidence for the meaning of a contract unless the text is ambiguous.[394]  To be ambiguous, a provision must be "reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[395]  If ambiguous, courts can look at "overt statements and acts of the parties, the business context, prior dealings between the parties, and business custom and usage in the industry."[396]  The parties' disagreement about the meaning of the contract "will not, alone, render the contract ambiguous."[397]

A party can waive a contractual requirement or condition, but the standards for doing so are "quite exacting."[398]  To waive a provision means to "voluntar[ily]

---

[392] *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 56 (Del. 2019) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[393] *ArchKey*, 302 A.3d at 988 (quoting *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)) (internal quotation marks omitted).

[394] *See, e.g.*, *Cox Commcns., Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022) (citing *Exelon Generation Acqs., LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017)).

[395] *Cox Commcns.*, 273 A.3d at 760 (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)) (internal quotation marks omitted).

[396] *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 476 (Del. Ch. 2022) (quoting *Salamone*, 106 A.3d at 374) (internal quotation marks omitted).  *See also In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (citing *Eagle Indus.*, 702 A.2d at 1233).

[397] *Kemp*, 991 A.2d at 1160 (citing *Rhone-Poulenc Basic Chem. Co.*, 616 A.2d at 1195).

[398] *See AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005) (citing *Am. Family Mortg. Corp. v. Acierno*, 640 A.2d 655 (TABLE), 1994 WL 144591, at *5 (Del. 1994)).

and intentional[ly] relinquish[] a known right."[399]  To establish that a right has been waived, the party must demonstrate that "(1) there is a requirement or condition to be waived, (2) the waiving party must know of the requirement or condition, and (3) the waiving party must intend to waive that requirement or condition."[400]  "Waiver involves 'knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those contractual rights.'"[401]  A waiver must be "clear and unequivocal."[402]  The waiver can be either written or oral or "by a course of conduct just like any other contractual provision."[403]

> ii.       *The Law on Declaratory Judgment*

The Declaratory Judgment Act authorizes a court to issue a declaratory judgment so long as there is an actual controversy between the parties.[404]  An "actual controversy" has four elements:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be

---

[399] *In re Coinmint, LLC*, 261 A.3d 867, 893 (Del. Ch. 2021) (quoting *AeroGlobal*, 871 A.2d at 444) (internal quotation marks omitted).
[400] *Javice v. JP Morgan Chase Bank, N.A.*, 2023 WL 4561017, at *4 (Del. Ch. July 13, 2023) (quoting *AeroGlobal*, 871 A.2d at 444).
[401] *Simon-Mills II, LLC v. Kan Am. USA XVI Ltd. P'ship*, 2017 WL 1191061, at *34 (Del. Ch. Mar. 30, 2017) (quoting *AeroGlobal*, 871 A.2d at 444) (internal quotation marks omitted).
[402] *Perik v. Student Res. Ctr., LLC*, 2024 WL 181848, at *4 (Del. Ch. Jan. 17, 2024) (citing *Javice*, 2023 WL 4561017, at *4).
[403] *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1229 (Del. Ch. 2000) (citing *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972)).
[404] *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1216–17 (Del. 2014) (citing *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479 (Del. 1989)).

between parties whose interests are real and adverse; [and] (4) the issue involved in the controversy must be ripe for judicial determination.[405]

Declaratory judgment is "born out of practical concerns, affording efficient relief where a traditional remedy is otherwise unavailable."[406] Declaratory judgment is thus a "statutory action; it is meant to provide relief in situations where a claim is ripe but would not support an action under common-law pleading rules."[407]

iii.      *The APA and the Amendment Support the Interpretation that JanCo Retains the Adjustment Amounts if Not Obtained by the Deadline.*

Section 6.1(d) required ISS to obtain all the Unobtained Required Consents within 120 days of Closing such that for all consents "obtained and delivered" by ISS to JanCo within that period, JanCo

> [S]hall authorize and instruct, jointly with [ISS], the Escrow Agent to release and pay to Sellers out of the escrow account an amount equal to the purchase price adjustment set forth opposite the name of each Target Account on <u>Schedule 2.2(f)</u> for which an Unobtained Required Consent is obtained and delivered during the 120-day period immediately following the Closing Date; *provided, further, that,* if any of the Unobtained Required Consents are not ultimately obtained and delivered by [ISS] within the 120-day period following the Closing Date, then the Escrow Agent, without further instruction from [ISS] or [JanCo], shall release and pay to [JanCo] any amounts remaining in the escrow account relating to the Unobtained Required Consents upon the expiration of the 120-day period.[408]

---

[405] *Id.* (quoting *Stroud*, 552 A.2d at 479–80) (internal quotation marks omitted).

[406] *Blue Cube Spinco LLC v. Dow Chem. Co.*, 2021 WL 4453460, at *13 (Del. Super. Sept. 29, 2021) (citing *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1238 (Del. Ch. 1987)) (internal quotation marks omitted).

[407] *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *29 (Del. Ch. Nov. 26, 2014).

[408] APA § 6.1(d) (emphasis in original).

There is no dispute that the FAA and Pima County consents were not obtained until after March 31, 2022—the end of the 120-day period.[409] ISS asserts that despite this, it is still entitled to the purchase price adjustments for both accounts because the "only reasonable interpretation of the APA requires [JanCo] to pay the Potential Adjustments for any consents that [ISS] delivered and [JanCo] accepted."[410] JanCo disagrees, arguing that ISS's interpretation would "require the Court to (1) entirely ignore ISS's contractual obligations to timely provide the consents and (2) impose a non-existent obligation upon JanCo that ISS never bargained for."[411]

The parties discuss the relevance of several Delaware cases, so the Court will do the same.

In *PR Acquisitions, LLC v. Midland Funding LLC*,[412] the Court of Chancery considered obligations of an escrow agreement entered into relating to a corresponding asset purchase agreement.[413] The purchase agreement included a repurchase provision for ineligible accounts wherein the purchaser must pay the adjustment amount for each account being repurchased within a designated time period subject to certain notice requirements.[414] The court determined that the escrow agreement was "express and clear" and "require[d] the release of the escrow

---

[409] JanCo Br. 11; ISS Br. 35.
[410] ISS Br. 35–36.
[411] JanCo Br. 12.
[412] 2018 WL 2041521 (Del. Ch. Apr. 30, 2018).
[413] *Id.* at *3.
[414] *Id.* at *3–4.

funds if there is no timely claim before the expiration date[.]"[415]  The parties both agreed there was no notice in compliance with the escrow agreement.[416]  The party that failed to give notice attempted to argue that "the contract does not call for strict compliance with its own terms" but the court was unconvinced.[417]  Noting that the agreement was clear, and there was no dispute that the agreement's provisions were not met, the court applied the terms as written and granted summary judgment against the party failing to give notice.[418]

In *American Healthcare Administrative Services, Inc. v. Aizen*,[419] the Court of Chancery also enforced the agreement terms as written and released escrow funds as contracted.[420]  The court considered the plain meaning of multiple terms of a purchase contract to find that "[a]s soon as the requirements were met" the escrow requirements must be followed—requirements the court referred to as "mandatory."[421]

JanCo relies on these two cases as evidence that "the terms of the APA dictate how and when the escrow funds should be released."[422]  ISS argues the two cases are "inapposite" and "[i]f anything, these decisions support [ISS] by sharpening the

---

[415] *Id.* at *6.
[416] *Id.*
[417] *Id.* at *7.
[418] *Id.*
[419] 285 A.3d 461 (Del. Ch. 2022).
[420] *Id.* at 476–77.
[421] *Id.* at 477–78.
[422] JanCo Br. 13.

contrast between the operative agreements[.]"[423]   While the Court acknowledges every contract is unique the Court will apply the contract based on its ordinary meaning.[424]

The fact that the parties may disagree on the reasonable interpretation of the contract does not render the contract ambiguous.[425]   The APA in this case is not ambiguous: it requires release of the adjustment amounts to ISS if they are obtained within the 120-day deadline; otherwise, JanCo is entitled to the remaining escrow funds.   ISS's "third scenario"—that ISS is entitled to the adjustment amounts no matter when the consents are obtained—is not based on the language of Section 6.1(d).

ISS argues it is "inequitable and absurd" for JanCo to be able to obtain the consents, and keep the adjustment amounts, just because ISS failed to meet the deadline.[426]   ISS, however, fails to explain why there is a deadline at all if ISS can always obtain the adjustment amounts, even if it fails to meet the deadline.   To interpret the APA in this way would be to either render the deadline itself superfluous, or ISS's obligations to "continue to use their commercially reasonable efforts to deliver"[427] the consents, and to "work cooperatively and in good faith to

---

[423] ISS Opp'n 29–30.
[424] *See* JanCo Reply 12–13.
[425] *See, e.g.*, *Manti Hldgs., LLC v. Authentix Acq. Co.*, 261 A.3d 1199, 1208 (Del. 2021) (citing *Osborn*, 991 A.2d at 1160).
[426] ISS Opp'n 24.
[427] APA § 5.17(c).

66

obtain the Required Consents[.]"[428]  It is not a reasonable interpretation to render certain portions of a contract meaningless;[429] therefore, the Court cannot reasonably adopt ISS's argument that it was indefinitely entitled to an adjustment amount *if* a consent ever was obtained.  It is also a matter of common sense that the parties would agree to an incentive to obtain the consents, such that it would be mutually beneficial for both parties: JanCo gets the contracts sooner, and ISS gets its adjustment amount. The alternative would require JanCo to always be prepared to return the adjustment amount, indefinitely, no matter how long it took for the consents to be obtained.  The Court considers this alternative "absurd" and declines to adopt it.

ISS also attempts to direct the Court to the Escrow Agreement as evidence of the parties' intent,[430] but such an argument is irrelevant unless the APA is ambiguous.  Courts only look to external evidence to resolve ambiguous terms[431]— which is not the case here—so the Escrow Agreement cannot instruct the Court's analysis.  The terms of the APA are clear that adjustment amounts are paid to ISS when the consents are obtained within the contractually agreed deadline.  There is

---

[428] *Id.* § 5.19(a).

[429] *See, e.g.*, *In Re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d at 56 (citing *Osborn*, 991 A.3d at 1159).

[430] ISS Opp'n 24–25.

[431] *See, e.g.*, *Holifield v. XRI Invs. Hldgs. LLC*, 304 A.3d 896, 924 (Del. 2023) (quoting *City Investing Co*, 624 A.2d at 1198) ("If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent.") (internal quotation marks omitted).

no dispute that the consents were obtained after the deadline, and therefore the Court

must reinforce the terms of the contract and find in favor of JanCo.

### iv. JanCo did not Amend or Waive the Consent Deadlines.

As an alternative road to recovery, ISS attempts to argue that JanCo amended

or waived the consent deadlines for the FAA and Pima County consents, and

therefore ISS is entitled to the adjustment amounts.[432]

As to an amendment to the deadlines, the APA is clear: "No amendment of

any provision of this Agreement shall be valid unless the same shall be in writing

and signed by [JanCo] and [ISS]."[433]  There is no dispute of fact—both parties never

signed an amendment to the deadlines for the FAA or Pima County consents.[434]  The

Court therefore declines to re-write the plain terms of the APA and find that any

amendment was otherwise made.

As to waiver, there is no dispute the first two elements for waiver under the

law[435]—there is a condition capable of being waived, and the waiving party knows

---

[432] *See, e.g.*, ISS Opp'n 25–27.

[433] APA § 9.13.

[434] *See, e.g.*, ISS Opp'n 25–30 (arguing for a waiver, but failing to substantively argue an amendment was signed by both parties); JanCo Opp'n 34.  ISS's argument that the parties signed a novation agreement for the assignment of the FAA contract form ISS to JanCo is insufficient. ISS Reply 14.  ISS fails to explain how signing this agreement alone constituted an extension to the deadlines.  *See* JanCo Opp'n 34.

[435] The APA also requires "No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver . . . ."  APA § 9.13.  The Court notes that a waiver may also occur orally or through course of conduct, so despite no signed waiver, the Court considers ISS's waiver arguments.  *See* ISS Reply 12 (citing *Pepsi-Cola Bottling Co. of Asbury Park*, 297 A.2d at 33).

of that condition—are satisfied in favor of ISS.  ISS, however, fails as to the third element:  ISS cannot demonstrate that "the waiving party intends to waive that condition."[436]  As its primary evidence, ISS cites a JanCo executive's email wherein he stated, "Our intent is clear to extend the relevant deadlines."[437]  ISS also cites several examples of JanCo's "course of conduct," including that JanCo released the adjustment amount for Capital Tower, another consent that was obtained outside of the deadline without a signed amendment allowing an extension.[438]

The fatal flaw in ISS's waiver argument, however, is that even if the Court credits that all the correspondence between the parties about *potentially* extending the deadlines indicated a waiver, that waiver was always intended to only be an additional sixty days.[439]  Both the FAA and Pima County consents were obtained beyond this additional sixty day period.[440]  The Capital Tower consent, on the other hand, was obtained within that potential sixty day extended deadline.[441]  Even if the Court finds that JanCo did waive the deadline for sixty days, ISS still failed to meet the extension.  The Court, therefore, **GRANTS** JanCo's motion and **DENIES** ISS's motion as to ISS's entitlement to the FAA and Pima County Adjustment Amounts.

---

[436] *See* ISS Opp'n 25–26.
[437] ISS Br. 37 (citing Tunney Aff. Ex. 46, at JANCO-00139422).
[438] ISS Opp'n 26–27 (citing Xu Aff. Exs. 114–116).
[439] *See, e.g.*, JanCo Reply 9–10 (citing Masi Exs. H, K).
[440] *Id.*
[441] *Id.*

## 2. *Ingram Micro*

### a. JanCo's Count V, the Implied Covenant Claim, is Dismissed.

Both parties brief JanCo's Count V (breach of the implied covenant) in conjunction with ISS's Count I (breach of contract), arguing that each should be found in their own favor. For the same reasons that the Court grants JanCo's motion as to ISS's Count III claim for breach of the implied covenant, the Court grants ISS's motion to JanCo's Count V claim for breach of the implied covenant. The Court will delve further into the Ingram Micro consent issue below,[442] but notes for the purposes of this section, that despite dismissing JanCo's implied covenant claim, JanCo may still assert its arguments as to why ISS is not entitled to the Adjustment Amount in the context of the contractual obligations.

The APA and the Amendment entirely govern the requirements to obtain the consents, turn over the escrow amounts in concurrence with obtaining the consents, and to share information as part of that process. Section 4.22 of the APA explicitly states that "[s]ince December 31, 2020, no Target Account that is a party to a Material Contract has terminated such Material Contract or has threatened to do so . . . ."[443] Section 5.17 obligates ISS to forward any "payment, correspondence or other materials pertaining to the Target Accounts" to JanCo that are received from a

---

[442] *See infra* Section IV. B. 2. b.
[443] APA § 4.22.

third party.[444]  Section 5.19(a) requires ISS to "undertake commercially reasonable efforts to include [JanCo] in discussions with the Target Accounts related to obtaining the foregoing consents . . . ."[445]

JanCo asserts the implied claim should proceed for "ISS's failure to inform JanCo that a looming divestiture by Ingram Micro would cut the amount of business it received from Ingram Micro in half."[446]  Even if the Court agrees that ISS did fail to inform JanCo about this divestiture, the APA's aforementioned Sections provide the authority wherein ISS would have a contractual obligation to do so—there is no gap that needs to be filled.  The escrow amount relating to Ingram Micro is an issue embedded in breach of contract allegations.  Therefore, ISS's motion for summary judgment is **GRANTED** as to JanCo's Count V.

   b. <u>All Remaining Issues Relating to the Ingram Micro Consent will Proceed to Trial.</u>

It is undisputed that ISS obtained the consent from Ingram Micro on January 30, 2022, within the 120-day window to obtain the deadline pursuant to APA § 6.1(d).[447]  As discussed in the previous section, JanCo argues that despite obtaining the consent from ISS for the Ingram Micro account, there is a remaining fact dispute about the total amount ISS is entitled to recover.[448]  By failing to inform JanCo of

---

[444] *Id.* § 5.17(b).
[445] *Id.* § 5.19(a).
[446] JanCo Opp'n 35.
[447] ISS Br. 33; JanCo Opp'n 34–35.
[448] JanCo Opp'n 34–35.

the impending divesture of Ingram Micro to CEVA, JanCo alleges, ISS breached disclosure obligations. Furthermore, ISS's past service issues prevented JanCo from obtaining all the Ingram Micro assets JanCo was entitled to.[449] ISS disputes these allegations, stating "JanCo cites no *credible* evidence to supports its novel theory that ISS knew about the impending divestiture of half of Ingram Micro's business months before the APA closed."[450] Similarly, ISS asserts, "the record is squarely to the contrary" that ISS failed to uphold its APA requirements to disclose materials to JanCo.[451]

The Court declines to consider the "credibility" of the evidence JanCo relies on at the summary judgment stage. Inferring all reasonable inferences in JanCo's favor, there is a possibility that reasonable minds could differ based on the record established as to whether or not ISS adequately abided by APA Sections 4.22, 5.17, and 5.19. Pitcock is involved in many of the disputes pending before the Court. Pitcock's role working with Ingram Micro to obtain the consents, signing the Novation Agreement for Ingram Micro and CEVA, and how he represented his role to his employer and related third parties, is relevant to determine when ISS was aware of the divestment, and when JanCo was notified. Further, Pitcock testified

---

[449] *Id.* 35–36.
[450] ISS Reply 7 (emphasis added).
[451] *Id.* at 9.

that he spoke with a JanCo Executive before signing the Novation Agreement, which contradicts JanCo's characterization of when it learned of the divestment.[452]

JanCo further argues that ISS "was mismanaging Ingram Micro's remaining business" creating a "poor-performance backdrop" for JanCo to "approach CEVA about retaining services."[453] Coinciding with the disputes surrounding the Net Working Capital,[454] ISS stated it would be "willing to discuss a compromise on Ingram Micro."[455] Whether or not JanCo will be able to conform its various criticisms of ISS's dealings with Ingram Micro and CEVA into a breach of the aforementioned Sections of the APA or not, is a question better reserved for determination in light of the entire factual record, when the Court can determine the credibility of evidence and the entire context of what correspondence was provided, and what role the sender was serving when sent. Therefore, ISS's motion as to ISS's Count I is **DENIED**; both parties will be able to present evidence on the Ingram Micro issue at trial.

---

[452] *Compare* Masi Aff. Ex. A, at 438:15–439:24 (noting that Pitcock spoke to John Maynard before "approving of the transfer of the Ingram Micro to CEVA"), *with* Xu Aff. Ex. 124, at JANCO-00197547 (showing that Pitcock shared the Novation Agreement with JanCo "for possible inspiration on the revision"). JanCo asserts that Pitcock's forward of the Novation Agreement did not contain a signed copy, only a blank copy "to show how other firms were handling their own collection of consents." JanCo Opp'n 17.

[453] JanCo Opp'n 17–18.

[454] *See infra* Section IV. D.

[455] Tunney Aff. Ex. 97, at JANCO-00118849.

## C. The Holdback Amount

### 1. *Declaratory Judgment Law on Duplicative Claims and Overripeness*

"The decision to entertain an action for declaratory judgment is discretionary with the trial court."[456]  A declaratory judgment claim that mirrors a common law claim cannot proceed because the two are duplicative.[457]  A claim is duplicative if the issues will "necessarily [] be decided, positively or negatively, in the resolution of" the other claim.[458]  It follows then, that "a declaratory count must be 'distinct' from the affirmative counts in the complaint such that a decision on the affirmative counts would not resolve the declaratory count."[459]  Avoiding duplicative counts promotes the "efficiency-based rationale animating declaratory judgment jurisdiction."[460]  A court can decline to issue declaratory judgment where such a claim would "not advance the litigation, but rather, would waste judicial resources."[461]

---

[456] *Burris v. Cross*, 583 A.2d 1364, 1372 (Del. Super. 1990) (internal citations omitted).
[457] *See id.* at 1372–76 (dismissing a declaratory count where plaintiffs sought common-law and equitable affirmative remedies, in contract, tort, and equity).
[458] *See Intermec IP Corp.*, 2021 WL 3620435, at *25.
[459] *Blue Cube Spinco LLC*, 2021 WL 4453460, at *15.
[460] *Id.* (citing *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *15 (Del. Super. Jan. 31, 2019)).
[461] *Intermec IP Corp.*, 2021 WL 3620435, at *25 (citing *Stroud*, 552 A.2d at 480).

"Overripeness"—a rarely used challenge in Delaware courts[462]—also implicates the court's "limited judicial resources."[463] Where "the mere existence of another remedy does not require dismissal, it can constitute sufficient grounds for dismissal in the Court's discretion."[464] The Superior Court outlined seven factors to consider when determining whether a given claim is overripe and should be dismissed.[465] All courts, however, have not applied the seven factor analysis,

[462] *See CRE Niagara Hldgs.*, 2023 WL 2625838, at *8 ("As an initial matter, the term 'overripe' as used in this context appears in only six Delaware cases: *Burris*, both previously-published decisions in this case, *Markusic*, and two other Superior Court cases. Put differently, there aren't many decisions discussing this doctrine.").

[463] *Burris*, 583 A.2d at 1372 (noting that overripeness is the opposition to a "typical declaratory judgment action, [where] an *unwilling litigant* will have cast a cloud upon a property right (or other legal interest) of the declaratory plaintiff, *but will not have moved forward to litigate the claim*.") (internal citations omitted) (emphasis in original).

[464] *Id.* at 1376 (dismissing a case in Superior where the action in the Court of Chancery "appears to be not only 'equally serviceable,' but indeed superior to the remedy available in this Court.").

[465] *Id.* at 1372 (considering "if the plaintiff cannot show good reason why the conventional action pending in Chancery should be avoided in favor of this declaratory judgment action, then in my opinion use of this type of action may be inappropriate and, in the sound discretion of the Court, jurisdiction may be declined").

> In considering the appropriateness of a declaratory judgment action under the facts and circumstances of this case, I believe that I should consider the following factors:
>
> 1. Whether the defendant is truly an unwilling litigant, thus necessitating declaratory action.
>
> 2. What form of relief is truly being sought by the plaintiff and whether that relief, if not solely a declaration of rights, would require resort to another court for supplemental relief. If so, whether both the rights and relief could be attained in a single non-declaratory action already available.
>
> 3. Whether another remedy exists and whether it would be more effective or efficient and, thus, whether declaratory judgment would serve a useful purpose.
>
> 4. Whether another action is pending, instituted either before or after the instant action, at the time of consideration of the Motion to Dismiss, and whether plaintiff would be able to raise all claims and defenses available in the instant action, as part of the pending action.
>
> 5. Whether the instant action has truly been instituted to seek a declaration of rights or merely for tactical or other procedural advantage.

"[w]here non-declaratory claims are pending in another court, the declaratory version of those same claims are overripe and risk the unnecessary burdening of the court's resources and the possibility of inconsistent factual and legal findings between the courts."[466]  The factors have since been relied on in cases where the same claims are being asserted in another court around a similar time.[467]

### 2. The Court Exercises its Discretion to Decline to Dismiss ISS's Count V.

JanCo seeks dismissal because ISS's declaratory judgment claim is (1) overripe and (2) duplicative of other claims.[468]  JanCo acknowledges that issuing a declaratory judgment is within the discretion of the trial court.[469]  While the Court agrees that JanCo's indemnification claims resemble the same issues in ISS's declaratory judgment, the Court declines to find that there is any judicial efficiency achieved by dismissing one claim from one party, in favor of another claim for another party, when a trial will resolve all claims at once.  The Court agrees with ISS that the claims "will rise and fall together."[470]

---

6. Whether the instant action was filed in an apparent anticipation of other pending proceedings.
7. Whether plaintiff will suffer any prejudice if the instant action is dismissed.
*Id.* at 1372–73.

[466] *Markusic v. Blum*, 2021 WL 2456637, at *5 (Del. Ch. June 16, 2021) (declining to provide declaratory relief, where non-declaratory relief was already sought in a California court).

[467] *See CRE Niagara Hldgs.*, 2023 WL 2625838, at *9 ("While *Markusic* was recently affirmed by the Delaware Supreme Court, the Court here would be remiss if it rested its decision on *Markusic* without engaging in the *Burris* analysis.").

[468] JanCo Br. 23.

[469] *Id.*

[470] ISS Opp'n 36.

If the claims are duplicative to the extent JanCo suggests, there is no additional burden on the Court, nor any additional burden on the parties to present evidence, if both claims proceed to trial concurrently. This is especially true where neither party has sought summary judgment on JanCo's indemnification claim. Regardless of the Court's decision as to ISS's Count V, the Court will still have to resolve the underlying indemnification issues based on ISS's unchallenged claims. JanCo's assertion that this point actually supports JanCo[471] is misplaced. It would be a different question if the Court were to choose to grant a summary judgment motion in JanCo's favor as to indemnification, then refuse to dismiss this mirrored count— judicial resources to resolve an issue at trial, already resolved at summary judgment would then undoubtedly be implicated.

JanCo chooses not to respond to ISS's assertion that JanCo failed to sufficiently brief the "overripeness" issue other than a statement that "JanCo's response brief appropriately presents the issues for the Court's consideration, invoking multiple authorities and explaining why this Court has discretion to dismiss the declaratory relief sought given the other claims in this case."[472] JanCo only meaningfully responds to ISS arguments as to duplicative claims, rather than overripeness. JanCo also fails to explain why opposing claims as to the same issues

---

[471] JanCo Reply 26.
[472] *Id.* 25–26.

77

would make trial any more complex. The Court will therefore consider the overripeness argument likely waived by JanCo.[473]

For completeness, however, the Court notes the significant difference between this case and previous cases dismissing on overripeness grounds: the overripe claims in this case are all within the pending action, not concurrently proceeding in another action in another court.[474] The judicial inefficiency of two courts handling similar or the same claims is clear; there is no similar judicial inefficiency before this Court where both claims appear before the same Judge, and will be determined in the same trial. The Court, thus, declines to determine whether consideration of *Burris*'s seven factors is necessary because there are no other courts currently managing these issues. The Court, therefore, exercises its discretion over declaratory judgment claims and **DENIES** JanCo's partial motion for summary judgment as to ISS's Count IV.

---

[473] *See Emerald P'rs*, 726 A.2d at 1224.

[474] *See, e.g.*, *CRE Niagara Hldgs.*, 2023 WL 2625838, at *10 (noting defendant was pursuing claims in New York, filed one day after the claims plaintiff filed in the Superior Court); *E.I. DuPont de Nemours & Co. v. Huttig Bldg. Prods.*, 2002 WL 32072447, at *4 (Del. Super. May 28, 2002) (analyzing *Burris* where there was a pending action in California filed one month after the action filed in Delaware); *Sec. Nat'l Mortg. Co. v. Lehman Bro's Hldgs, Inc.*, 2016 WL 6396343, at *7–8 (Del. Super. Aug. 24, 2016) (dismissing as overripe an action where Delaware Bankruptcy Court had already been dealing with the issues between the parties for several years).

**D.** **The Net Working Capital Dispute and the LaSalle Payments**

*1.* *The Contracts and the Law on Summary Judgment Discretion*

APA Section 2.5 governs the Net Working Capital Adjustment stating:

If the Actual Closing Date Working Capital, as finally determined pursuant to this Section 2.5, is greater than the NWC Target by more than $100,000.00 then [JanCo] shall pay to [ISS], as an adjustment to the Purchase Price, the amount by which (A) Actual Closing Date Working Capital exceeds (B) the NWC Target plus $100,000.00, paid in accordance with Section 2.5(f). If the Actual Closing Date Working Capital, as finally determined pursuant to this Section 2.5, is more than $100,000.00 less than the NWC Target, then [ISS] shall pay to [JanCo], as an adjustment to the Purchase Price, the amount by which (C) Actual Closing Date Working Capital is less than (D) the NWC Target minus $100,000.00, paid in accordance with Section 2.5(f).[475]

The APA Amendment provided that the "Parties further acknowledge and agree that the Purchase Price is hereby increased by the amount of the LaSalle Equipment Cost, and that at the Closing, [JanCo] shall pay to [ISS] additional consideration equal to the LaSalle Equipment Cost[.]"[476]

"There is no 'right' to a summary judgment[;]" a trial court has discretion and is "entitled to a high level of deference."[477] Further, "[s]ummary judgment is a harsh remedy that affects a party's substantive rights" so it "must be cautiously invoked, and is not a mechanism for resolving contested issues of fact."[478] A court "shall not

---

[475] APA § 2.5(e) (emphasis in original).
[476] Amendment § 3.
[477] *Empire Fin. Servs., Inc. v. Bank of New York (Delaware)*, 900 A.2d 92, 97 (Del. 2006) (internal quotation marks omitted).
[478] *GMG*, 36 A.3d at 783 (citing *Williams v. Geier*, 671 A.2d 1368, 1389 (Del. 1996)).

weigh the evidence or resolve conflicts presented by pretrial discovery."[479] The

Supreme Court of Delaware "consider[s] it an exercise of 'good judicial

administration [for a trial court] to withhold decision . . . until [the record] present[s]

a more solid basis of findings based on litigation or on a comprehensive statement

of agreed facts.'"[480]

### 2. *The LaSalle Tax Payment is Embedded in the Net Working Capital Dispute that Presents Fact Issues Better Reserved for Trial.*

ISS plead its Count IV, breach of contract claim, to encompass both the Net

Working Capital amount and the LaSalle Tax Payment (pled as the "Purchase Price

Adjustments"), but then briefed the issues separately in its motion for summary

judgment in favor of its own Count IV. ISS argues the parties "finally determined"

the Net Working Capital amount, and therefore unambiguous Section 2.5 requires

payment be made regardless of another other unresolved disputes.[481] ISS then

argues it is entitled to the LaSalle amount because Section 3 of the Amendment is

similarly unambiguous and JanCo did not dispute the amount.[482]

JanCo does not dispute a general obligation to pay the LaSalle tax payments,

but notes that it has not paid yet because the amount is "interlinked" with

---

[479] *AeroGlobal*, 871 A.2d at 444 (Del. 2005) (citing *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002)).
[480] *Id.* (quoting *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 257 (1948)).
[481] ISS Br. 31–32.
[482] *Id.* at 32–33.

outstanding issues, including the Net Working Capital calculation.[483]  Noting that the Net Working Capital amount was not actually "finally determined" as required by Section 2.5, JanCo is not yet obligated to pay the amount while the parties continue to work to resolve their disputes.[484]  JanCo instead argues fact disputes remain, especially considering JanCo has asserted claims for fraud and breach, which challenge the information ISS provided to represent the "financial condition of the Company."[485]

The Court cannot ignore that ISS asserted both the LaSalle payment and the Net Working Capital amount in the same count.  While not dispositive, it appears to the Court that ISS is seeking to have its cake and eat it too.  ISS considered the claims related enough to plead them together, but now seeks to differentiate them in summary judgment, but still plead the same argument: the contract is unambiguous, so JanCo should pay.  JanCo may in fact be required to pay these amounts, and to some extent JanCo acknowledges that it may be the one owing an amount at the resolution of the factual issues.  This concession alone is insufficient to grant summary judgment when there are remaining factual issues as to *what* the final payment should be.  The Court acknowledges the LaSalle amount appears to be undisputed, and is not subject to other calculations to the same extent the Net

[483] JanCo Opp'n 19 (citing Xu Aff. Ex. 114, at JANCO-00163465).
[484] *Id.* at 28.
[485] *Id.* at 30.

Working Capital amount is. These amounts, however, are all related to the Closing payments as agreed to by the parties, and the Court sees no reason to issue a piecemeal decision on a part of a count at this point.

The Court sees each party as selecting quotes from exhibits that can be read in isolation to support their position: ISS arguing a final determination was made; JanCo arguing one was not. It is undeniable that JanCo made statements that suggested some level of agreement with ISS's calculations, but those statements were all qualified, rather than an absolute "yes" or "we agree."[486] The Court finds this raises a sufficient factual dispute to preclude summary judgment at this time. It is entirely reasonable for disputing parties to concede to certain things as a negotiating tactic while working to solve other issues, and have that original concession be contingent on later resolutions—a possibility that is not unreasonable here. There are two reasonable interpretations of the various exhibits detailing the parties' correspondence on the Net Working Capital amounts such that it should be left to a fact finder to determine after trial.

In addition, it is not lost on the Court that JanCo has sought other claims not raised in this motion, including fraud, wherein JanCo challenges the ways in which

---

[486] *See, e.g.*, Tunney Aff. Ex. 74, at JANCO-00198571 ("We are in agreement on the amount of the NWC . . . subject to coming to agreement on all of the other issues resolved to our satisfaction.").

ISS represented the business, and may have inflated the assets' value.[487] JanCo's Count I is not raised by either summary judgment motion, and the Court makes no determination as to the potential success JanCo may have on such claim, but the Court disagrees with ISS's assessment that such a distrust is "meritless" because only one exhibit has been relied on to assert it.[488] If there is any merit that the financials provided to JanCo were incorrect, then JanCo may be able to establish that the amounts used in the Net Working Capital calculation are inaccurate as well. The Court, in its discretion, defers ruling on the Net Working Capital amount until all factual issues are presented and developed at trial.

### E. The Employee Disputes

#### 1. *The Covenant Not to Solicit*

Section 5.5 of the APA restricts ISS "for a period of three (3) years from and after the Closing Date" from "directly or indirectly" "solicit[ing] employment with [ISS] any person employed by [ISS] as of the Closing Date who is hired by [JanCo] and who provides services to the Target Accounts (other than through general solicitations which are not directed to specific individuals or companies)."[489] "Solicit" is not a defined term in the APA or the Amendment.[490] When a term in a

---

[487] *See* JanCo Am. Compl. ¶¶ 207–26.
[488] ISS Reply 5 (referring to Xu Aff. Ex. 115).
[489] APA § 5.5(b).
[490] *See generally* APA; Amendment.

contract is not defined, it is given its "ordinary meaning."[491]  "Solicit" therefore means, among other definitions, "to make petition to," "to approach with a request or plea," "to urge (something, such as one's cause) strongly," "to entice or lure especially into evil," "to proposition (someone) especially as or in the character of a prostitute," or "to try to obtain by usually urgent requests or pleas."[492]

### 2.    *The Law on Intentional Interference with Contractual Relations*

To allege a claim for intentional interference with contractual relations, a party must establish: "(1) the reasonable probability of a business opportunity, (2) the intentional inference by defendant with the opportunity, (3) proximate causation, and (4) damages, all of which must be considered in light of defendant's privilege to compete or protect his business interests in a fair and lawful manner."[493]  To establish the first element, the plaintiff "must identify a specific party who was

---

[491] *See, e.g.*, *Navient Sols., LLC v. BPG Off. P'rs XIII Iron Hill LLC*, 315 A.3d 1164, 1173 (Del. Super. 2024) (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006)) (relying on Merriam-Webster to define undefined terms in a contract).  *See also Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 339 (Del. 2022) (quoting *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1132 (Del. 2020) (internal quotation marks omitted) ("Words or phrases used . . . are to be given their commonly accepted meaning, and this Court 'often looks to dictionaries to ascertain a term's plain meaning.'") (relying on Black's Law Dictionary, Merriam-Webster, Cambridge Dictionary, and others).

[492] *Solicit*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/solicit (last visited Aug. 28, 2024). The Court does not consider this an exhaustive list of definitions of "solicit," but instead cites these as examples.

[493] *Halpern v. Maschauer*, 2013 WL 5755467, at *1 (Del. Super. Oct. 16, 2013) (citing *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980)).

prepared to entered [sic] into a business relationship but was dissuaded from doing so by the defendant and cannot rely on generalized allegations of harm."[494]

Courts have emphasized that "the adjective 'improper' is critical" because "[f]or participants in a competitive capitalist economy, some types of intentional interference with contractual relations are a legitimate part of doing business."[495] Delaware relies on the Second Restatement of Torts to determine "if intentional interference with another's contract is improper or without justification."[496] The factors to consider include:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interest sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference and
> (g) the relations between the parties.[497]

---

[494] *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017) (quoting *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009)).

[495] *New Enters. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 142 (Del. Ch. 2023) (quoting *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *26 (Del. Ch. Nov. 17, 2014)) (internal quotation marks omitted).

[496] *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012) (citing Restatement (Second) of Torts § 767 (1979)).

[497] *Id.* (quoting Restatement (Second) of Torts § 767 (1979)).

Analyzing if there has been an intentional interference is thus a "fact-specific inquiry to determine whether the interference with contract is improper under the particular circumstances of the case."[498]

### 3. Fact Issues Remain that Preclude Summary Judgment for Both Counts.

Both parties agree that Pitcock, Bartlett, and Rivas are implicated by the APA's Covenant Not to Solicit and may be relevant to an analysis of intentional interference with contract relations.[499] ISS, however, argues that JanCo has failed to satisfy its burden to present evidence in support of either claim as it relates to any of the three employees.[500] JanCo counters that there are genuine issues of material fact remaining to be resolved, and these issues are better reserved for trial.[501] The Court agrees with JanCo.

The Court takes note of ISS's allegations, and expresses some skepticism given the record presented in briefing, but nonetheless, highlights that both claims are factual-intensive inquiries which are not appropriate at the summary judgment stage.[502] Summary judgment is not the time to judge the credibility of potential

---

[498] *New Enters. Assocs. 14, L.P.*, 292 A.3d at 142.
[499] *See, e.g.*, ISS Br. 38–41; JanCo Opp'n 37–40. Both sides brief these counts together, so the Court similarly sees no reason to separate the analysis of the motions as to the related claims.
[500] ISS Br. 38–41; ISS Reply 15–22.
[501] JanCo Opp'n 37–40.
[502] *See, e.g.*, *Wilm. Tr., Nat'l Ass'n v. Sun Life Assurance Co. of Canada*, 294 A.3d 1062, 1071 (Del. 2023) ("If material issues of fact exist or if a court determines that it does not have sufficient facts to enable it to apply the law to the facts before it, then summary judgment is inappropriate.") (internal quotation marks omitted).

witnesses[503] nor to decide circumstantial conclusions based on several pieces of independent evidence.[504] Further, "[w]here the inference or ultimate fact to be established concerns intent or other subjective reaction, summary judgment is ordinarily inappropriate."[505] ISS asks the Court to conclude that the testimony of the involved persons—Pitcock, Bartlett, and Rivas—as well as documents including email correspondence and resignation letters preclude a finding on either count. As an initial matter, given all three individuals currently are employed with ISS, there is a credibility issue as to whether or not their characterization of the facts is the only reasonable interpretation.

JanCo has suggested that Bartlett has been found "not credible" in prior litigation.[506] This Court, by denying summary judgment, does not make a finding that these three individuals are not credible, only that it is more appropriate for the finder of fact to make that determination at trial based on depositions, documents in the record, and testimony at trial. The Court also notes that the circumstances

---

[503] *See, e.g.*, *Allen*, 113 A.3d at 177 (internal quotation marks omitted) ("If the matter depends to any material extent upon a determination of credibility, summary judgment is inappropriate."); *Nationwide Gen. Ins. Co. v. Mendes*, 2007 WL 1748651, at *2 (Del. Super. May 31, 2007) (denying summary judgment where facts relied on the credibility of particular witnesses).

[504] *See, e.g.*, *Smith v. Del. State Univ.*, 47 A.3d 472, 478 (Del. 2012) ("In deciding a motion for summary judgment, courts are permitted to consider that the plaintiff's testimony is self-contradictory and unsupported by other evidence, such that no rational juror could find in the plaintiff's favor."); *Burris v. Penn Mart Supermarkets, Inc.*, 2006 WL 2329373, at *2 (Del. Super. July 13, 2006) (noting that conflicting testimony can create an issue of fact).

[505] *AeroGlobal Cap. Mgmt.*, 871 A.2d at 446 (citing *George v. Frank A. Robino, Inc.*, 334 A.2d 223, 224 (Del. 1975)).

[506] JanCo Opp'n 38–39.

surrounding Pitcock's termination are disputed, such that JanCo asserts Pitcock may have sabotaged his own employment at JanCo with intentions of returning to ISS.[507] The record as to Rivas is less developed than for Pitcock or Bartlett, but the fact that Rivas indicated in his resignation to JanCo that he left for another offer,[508] leaves the open question for the fact-finder whether the other offer was from ISS, or somewhere else—a key distinction when determining the two counts at issue.

Arguments about what conclusion can be drawn from all three employees leaving JanCo off their LinkedIn profiles is a question for the fact finder—at best it is circumstantial evidence, but even the appropriate conclusion to be drawn is unclear. Only Bartlett addresses that choice;[509] the Court is left to guess the other two's reasoning based on the record presented.

All of these facts, among others, indicate that there are remaining issues of fact where a fact finder could find for either side. The Court, therefore, **DENIES** ISS's motion for summary judgment as to JanCo's Counts VII and VIII. The factual issues, and conclusions that can be drawn from the evidence, are best reserved for trial.

---

[507] *Id.* at 37–38. *See, e.g.*, Xu Aff. Ex. 126, at 223:5–19.
[508] *See* Xu Aff. Ex. 161.
[509] Masi Aff. Ex. C, 27:6–7 ("Because I do not want to be associated with those crooks.").

# V. CONCLUSION

In conclusion, ISS's Motion for Summary Judgment is **GRANTED** in part, and **DENIED** in part, and JanCo's Motion for Summary Judgment is **GRANTED** in part, and **DENIED** in part. More specifically, the Court herein dismisses JanCo's Count V and ISS's Counts I, II, and III. The Court **GRANTS** summary judgment for JanCo as to JanCo's Count IV relating to the FAA and Pima County consents. JanCo's Counts VII and VIII, and ISS's Counts IV and V all survive summary judgment. JanCo's Counts I, II, III, and VI also proceed unchallenged by the summary judgment motions.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams
**Meghan A. Adams, Judge**